161

                    Elka Gotfryd

1

2          Q.    Okay.  So when you say the City

3    didn't respond, didn't it conduct an

4    investigation?

5          A.    It did.

6          Q.    Okay.  And do you know who conducted

7    the investigation on the City's behalf?

8          A.    Mr. -- Dr. Coverdale.

9          Q.    Okay.  And were you interviewed by

10   Dr. Coverdale --

11         A.    I was.

12              MR. MEHNERT:  Hold on.  Let me

13         finish the question.  I know you know what

14         I'm asking.

15              THE WITNESS:  Sorry.

16         Q.    -- with regard to the investigation

17   that was being conducted into this letter and

18   whatever claims were being made therein?

19         A.    Yes.

20         Q.    Okay.  And do you know if anyone

21   else was interviewed?

22         A.    I believe Mr. Ms. Church.

23         Q.    Who else was present at your

24   interview, besides yourself and Dr. Coverdale, if

25   anyone?

162

                        Elka Gotfryd

1
2        A.    I believe Mr. Rauchet and
3    Mr. Williams were both there.
4        Q.    And did Dr. Coverdale ask you
5    questions about the evaluation and your response?
6        A.    Yes.
7        Q.    And did you answer all of his
8    questions?
9        A.    I believe so.
10        Q.    And was there any information or
11    follow-up information that he requested from you?
12        A.    I don't recall.
13        Q.    Okay.  Assuming he made some
14    requests, would you have complied with that?
15        A.    Yes.
16        Q.    Was there any information that you
17    didn't tell Dr. Coverdale during the course of
18    that interview, anything you left out?
19        A.    Certainly not intentionally.
20        Q.    Okay.  Was there anything that in
21    your mind he neglected to ask you about, based on
22    having written this letter?
23            Was there something that he left
24    out, in your mind?
25        A.    I don't recall.

1                    Elka Gotfryd

2          Q.    Okay.  And do you recall what the

3    outcome of the City's investigation of the

4    allegations contained in your September 21st,

5    2020 letter was?

6          A.    They -- the -- the letter that was

7    given to me in response of the investigation

8    deemed my claim to be unfounded.

9          Q.    Okay.

10          A.    Specifically about the -- the

11    violation of -- of -- of City ordinances.

12          Q.    And just so that I'm clear, that is,

13    on the first page of this document, Exhibit I,

14    you say, accordingly, I believe Ms. Church is in

15    violation of...  right?

16          A.    That's correct.

17          Q.    Okay.  And it's Item 65-12 of the

18    City's Work Place Violence Prevention Policy,

19    Item 34-20.A.1 of the City's Equal Opportunity

20    Employment and Anti-Harassment Policy, and

21    Item 34-4.8 of the City's Code of Ethics, those

22    are the three sections of the City code that you

23    accused Ms. Church of violating; is that right?

24          A.    That is correct.

25          Q.    And Dr. Coverdale concluded that

164

                     Elka Gotfryd

1

2    your allegations were unfounded; is that right?

3         A.    That those allegations were

4    unfounded.

5         Q.    Right.   That's what I'm saying.

6         A.    Yes.

7         Q.    He deemed that the accusations that

8    Ms. Church had violated, these provisions of the

9    City code, were not founded?

10        A.    Correct.

11        Q.    And then the City adopted those

12   findings?

13        A.    Correct.

14        Q.    Okay.   What is the Newburgh

15   Architectural Review Commission?

16        A.    The Newburgh Architectural Review

17   Commission is a -- one of the land use boards

18   that developers or homeowners or anyone

19   submitting a plan for any sort of alteration on a

20   structure within the East End Historic District

21   in Newburgh must go through in order to receive

22   approval to do -- to complete or actually

23   initiate and complete the action they wish to do.

24        Q.    Did you have interactions with this

25   commission?

165

1                    Elka Gotfryd

2          A.    Not regularly, no.

3          Q.    In November of 2020, were you

4    working on some sort of grant proposal?

5          A.    Yes.

6          Q.    For what grant were you preparing a

7    proposal?

8          A.    It was a grant for African American

9    Civil Rights history the National Park Service

10   had created, and I applied on behalf of the City

11   and a group of local organizations, in order to

12   secure $50,000 to document African American Civil

13   Rights history in Newburgh, which would then

14   inform updated historical preservation policy in

15   Newburgh.

16         Q.    And did anyone work on this grant

17   proposal with you?

18         A.    Yes.

19         Q.    And who did?

20         MR. MEHNERT:   Hold on.   Actually,

21         let me withdraw the question.

22         Q.    Did anyone else from the City work

23   on it with you?

24         A.    I received advice from other people

25   in the City.

166

1                     Elka Gotfryd

2          Q.    Okay.  But in terms of City

3    employees, you were the one doing the drafting

4    and ultimately submitting; right?

5          A.    Ultimately submitting was Helen.  I

6    can't remember her last name.  The grant's

7    manager.  She ultimately submitted, technically,

8    the grant.

9          Q.    Okay.

10          A.    And Ms. Church gave me some

11    guidance.

12          Q.    Okay.  Did anyone outside of the

13    City's employ work on this grant proposal with

14    you?

15          A.    Yes.

16          Q.    And who was that?

17          A.    A number of people.  My primary

18    partners in drafting it were Dr. Ann Pfau and

19    David Hoch -- Hochfelder, Hochhelder.  Ann Pfau

20    is P-F-A-U.  Hochhelder -- Hochfelder is -- I

21    don't believe I could spell that for you.

22          Q.    H-O-C-K-F-E-L-D-E-R.

23          A.    I believe it's H-O-C-H.

24          Q.    Okay.  And Dr. Pfau, where was she

25    affiliated?

167

1              Elka Gotfryd

2      A.    Both of them are affiliated with the

3  University of Albany.

4      Q.    Okay.  And so they were assisting

5  you in putting this proposal together?

6      A.    Yeah, they're -- yes.

7      Q.    What were they doing to assist you?

8      A.    They were assisting me with the

9  historic context.

10      Q.    Okay.

11      A.    And with -- specifically with the

12  context of the history of urban renewal.

13      Q.    I presume that the grant proposal

14  consisted of multiple documents; is that right?

15          MR. MEHNERT:  Let me ask it this

16      way.

17          MR. SUSSMAN:   Object.

18      Q.    The grant proposal itself, what did

19  it take the shape of?

20          What was it that made up the grant

21  proposal?

22      A.    Part of it was narrative.  Part of

23  it was photographic amendment.

24      Q.    Okay.  And so the photographs were

25  provided by whom?

168

1                     Elka Gotfryd

2          A.    Me.

3          Q.    You went around to various places

4     within the City and took the photographs?

5          A.    Correct.

6          Q.    Okay.  And I presume --

7          A.    And -- and the historical record of

8     I believe -- I believe we also included

9     photographs from the original historic district

10    nomination.

11         Q.    Okay.

12         A.    So those I, obviously, didn't take,

13    because it was 1985.  Before I was born.

14               MR. MEHNERT:  Off the record.

15               (There was a discussion held off the

16         record.)

17         Q.    In working on the grant, was there

18    in, the narrative that you were preparing, was

19    there some reference to the City's Architectural

20    Review Commission being some sort of all white

21    entity?

22         A.    In the final grant, what we

23    submitted?

24         Q.    In any version of it.

25         A.    Yes.

169

1           Elka Gotfryd
2       Q.    And so what was the context in which
3   there was a reference to the Architectural Review
4   Commission?
5           MR. SUSSMAN:   Note the objection to
6       form, but you can answer.
7           What the context of that writing
8       was, I take it he's asking --
9           MR. MEHNERT:   Yes.
10          MR. SUSSMAN:    If you remember.
11          THE WITNESS:   The -- my co-authors
12      and I were trying to frame the issue of
13      historic preservation in Newburgh as one
14      that -- we -- we felt that there was a
15      problem with the fact that there was not
16      enough representation of minority
17      communities on the Board.
18      Q.    And why did you believe that that
19   was a problem?
20      A.    Why did I believe there was a
21   problem that there wasn't representation --
22      Q.    Yes.
23      A.    -- of minority communities on the
24   board?
25      Q.    Yes.

170

1                     Elka Gotfryd

2          A.    Because Newburgh is a -- the City of

3    Newburgh is majority racial minority.   And

4    ideally, in a democracy, we -- for those of us

5    want the democracy to function, we like to have

6    people who represent the community in government

7    bodies.

8          Q.    Okay.   Did you feel that the Review

9    Commission was in some way acting in a

10   inequitable way towards these racial minorities?

11         A.    Yes.

12         Q.    And why did you feel that way?

13              MR. SUSSMAN:   What about what they

14         were doing made her feel that way?

15              MR. MEHNERT:   Yes.   Whatever the

16         basis for her belief was.

17              MR. SUSSMAN:   So what actions did

18         they take or inactions caused her to feel

19         that way.

20              MR. MEHNERT:   Yes.

21              MR. SUSSMAN:   Okay.   Go ahead.

22              THE WITNESS:   The reason why I feel

23         that way is because historic preservation

24         in Newburgh tends to prioritize the

25         preservation of the structures themselves,

171

1                    Elka Gotfryd

2          rather than the people who live in them

3          and the communities who use them.

4          Q.   Okay.  And this reference to the

5   Review Commission was contained in the narrative

6   portion of this grant proposal; is that right?

7          A.   Yes.

8          Q.   Okay.  I presume that the narrative

9   portion or the entire proposal was submitted at

10  some point to Ms. Church, for her review; is that

11  correct?

12         A.   Yes.

13         Q.   And when she reviewed it, did she

14  have any objection to the reference to the

15  Architectural Review Commission as an all white

16  entity?

17         A.   She did have an objection to that,

18  but that was not when she reviewed the entire

19  proposal.

20         Q.   Okay.  So when did she review the

21  entire proposal?

22         A.   I'm not sure if she reviewed the

23  entire proposal.

24         Q.   Okay.  So how did you become aware

25  she had an objection to this reference about the

1              Elka Gotfryd
2    Architectural Review Commission?
3          A.    She came into my office and told me
4    she had an objection.
5          Q.    Okay.  And did you understand that
6    she had seen this reference because she had
7    reviewed it in the proposal documents at some
8    point?
9          A.    No.  She saw it in an e-mail that I
10   had sent her.
11         Q.    Okay.  And so the e-mail, did it
12   contain a similar reference, or did the e-mail
13   attach a copy of the draft?
14              How was it that this came up in an
15   e-mail, as opposed to separately from the
16   narrative grant proposal?
17         A.    It came up in an e-mail because we
18   were trying to get letters of support from
19   different organizations, stakeholders,
20   politicians for the grant proposal, because we
21   believed it would strengthen our proposal.
22         Q.    Okay.
23         A.    I sent her a paragraph or two about
24   the grant, so that she could help me contact
25   specifically Congressman -- sorry -- yeah,

173

1                    Elka Gotfryd
2    Congressman Maloney's office.  And when she read
3    the e-mail that I sent her, with this blurb about
4    the grant, in that were -- was the reference that
5    we are referring to.
6            Q.    Okay.  And so you said that she came
7    in and spoke to you about this; is that right?
8            A.    Correct.
9            Q.    And what did she say, when she came
10   in to speak with you?
11           A.    Something along the lines of, you
12   can't say that about the Architectural Review
13   Commission.
14           Q.    And did she explain to you why?
15           A.    Not in that moment.
16           Q.    Okay.  And what else did Ms. Church
17   say, if anything, besides, you can't say that
18   about the Architectural Review Commission?
19           A.    When she came into my office?
20           Q.    Yes.
21           A.    I don't recall.
22           Q.    What did you say in response, if
23   anything?
24           A.    Something along the lines of, huh.
25   I was very surprised.

174

1                    Elka Gotfryd
2         Q.   Why were you very surprised?
3         A.   I did not know to what she was
4    referring.
5         Q.   Did you come to have an
6    understanding about what it was she was referring
7    to?
8         A.   Eventually.
9         Q.   Okay.  And how did you come to have
10   that understanding?
11        A.   I approached her in her office.
12        Q.   And how long after it was that --
13   she comes into your office, says this to you, how
14   long of a time gap between that and then you
15   going in to speak with her about it?
16        A.   It was very quick.  I first reviewed
17   the e-mail that I had sent her, to see if I could
18   understand what she was referring to.  And then I
19   went into her office.
20        Q.   Okay.  And what did you say when you
21   went into Ms. Church's office?
22        A.   I asked for clarification.
23        Q.   And what specifically did you say?
24        A.   I don't recall.
25        Q.   And what, if anything, did

175

1                    Elka Gotfryd
2    Ms. Church say in response?
3         A.    I believe she said that I can't
4    refer to the fact that they're all white.
5         Q.    And did she explain why?
6         A.    She expressed that she believed the
7    City would be opening itself up to a
8    discrimination lawsuit.
9         Q.    And what, if anything, else did she
10   say?
11        A.    She told me that in order to refer
12   to the racial compensation of the Board, we would
13   need to do a study to prove it.
14               Can we --
15        Q.    Did she say anything else?
16               (Reporter clarification.)
17               (There was a discussion held off the
18        record.)
19        Q.    Did she say anything else to you
20   during the course of that meeting?
21               And this is the one where you went
22   into her office.
23        A.    I don't want to repeat myself.
24   Could you repeat to me what I've already shared.
25        Q.    Sure.  You indicated that Ms. Church

176

1                      Elka Gotfryd

2    told you that you can't say that the

3    Architectural Review Commission is all white.

4    That the City would be opening itself up to a

5    lawsuit.  And that they would have to do some

6    sort of a study with regard to the fact that the

7    Commission was all white.

8          A.    Yes.

9          Q.    So what else did she say during the

10   course of that meeting?

11         A.    She told me to -- she told me she

12   needed to review all documents before and all

13   correspondences before I am to reach out to

14   people.  And that I should not reach out to

15   people without her approval.

16              She also said something about how

17   with work you try and fail and try and fail until

18   you try and succeed, and how she was trying to

19   get me to the point of succeeding.  So

20   insinuating that I was failing.

21         Q.    And did she say anything else, that

22   you recall?

23         A.    I don't recall at this time.

24         Q.    Do you recall anything you said to

25   her, in response to any of these statements?

177

1                    Elka Gotfryd

2        A.   Yes.

3        Q.   And what did you say to her?

4        A.    At first, when she said, I need to

5    review all documents first, I said, okay, now

6    that you've seen this and now that you know that

7    I've reached out to people for this grant, as I

8    was initially directed, what would you like me to

9    do moving forward?

10            I am now remembering that she did

11   say -- she did also say -- I had said to her, you

12   told -- you told me, when I started writing this

13   grant, that I should reach out to all of these

14   people to receive their letters of support.  And

15   now you're telling me otherwise.  And she said,

16   well, I shouldn't have told you that.

17       Q.   Okay.

18       A.    So I had originally received a

19   directive to reach out to a group of stakeholders

20   whom we agreed would be good people to write

21   letters of support.

22       Q.   Okay.

23       A.    And so her response was, I shouldn't

24   have said that.

25       Q.    And what else, if anything, did you

178

1                    Elka Gotfryd

2    say during the course of this meeting?

3         A.   I told her -- I asked her to stop

4    interrupting me so I could finish a sentence.  I

5    continuously asked her:  What would you like me

6    to do now?  She continuously responded, you need

7    to run things by me.  I said, I am running things

8    by you.  I have specific questions right now.

9              There was an escalation.  I became

10   frustrated and became quite emotional.

11        Q.   When you say, became frustrated, how

12   did you come become frustrated?

13        A.   What do you mean, how?

14        Q.   You became frustrated with what?

15        A.   Circular -- what I felt was an

16   unproductive conversation.

17        Q.   Okay.  And did you raise your voice

18   during the course of this meeting?

19        A.   I did.

20        Q.   And did Ms. Church raise her voice?

21        A.   She did.

22        Q.   And you say you became emotional,

23   what do you mean by that?

24        A.   I eventually left her office and

25   cried.

179

1                    Elka Gotfryd

2    Q.    How long did this meeting last?

3    A.    Minutes.

4    Q.    Less than ten minutes?

5    A.    Oh, yeah.

6    Q.    Less than five minutes?

7    A.    Possibly.  Probably.

8         MR. MEHNERT:  All right.  I know you

9    said you wanted to take a break, so why

10   don't we take the break now, since we

11   finished with the meeting itself.

12        THE WITNESS:  Perfect.  Thank you

13   very much.

14        (Whereupon, there was a recess

15   taken.)

16        MR. MEHNERT:  Can you mark this,

17   please.

18        (Defendants' Exhibit J, 12/22/2020

19   letter to Mr. Donat and Ms. Kelson, was

20   marked for identification.)

21        MR. MEHNERT:  We're back on.

22        THE WITNESS:  May I add to my most

23   recent response?

24        MR. MEHNERT:  Sure.  Go ahead.

25        THE WITNESS:  Something came to

180

1              Elka Gotfryd

2        mind.  You had asked about what she said

3        when I entered her office, and one of the

4        other things she said was that I continue

5        to have, quote unquote, these beliefs.

6        She referred to, these beliefs.  And I

7        tried to clarify what that meant.  I

8        have -- I have yet to receive

9        clarification of that what meant.

10        Q.   And when you say that you asked for

11   clarification, what did you say?

12        A.   What do you mean?  I said, what do

13   you mean?

14        Q.   And did Ms. Church respond?

15        A.   I believe her response was that I

16   try and fail, and try and fail.

17        Q.   Okay.  And did Ms. Church say

18   anything else?

19        A.   I don't recall at this time.

20        Q.   And do you recall anything else that

21   you said?

22        A.   Not at this time.

23        Q.   Okay.  Did you understand that you

24   your statement about the Architectural Review

25   Commission might be something that offended the

181

1                    Elka Gotfryd

2    members of the Commission?

3         A.    Could --

4              MR. SUSSMAN:    To be clear, the

5         statement that it's an all white

6         Commission might offend them?

7              MR. MEHNERT:    Yes.

8              THE WITNESS:    Can you repeat the

9         question.

10             MR. MEHNERT:    Sure.

11        Q.    Did you understand that your

12   statement about the Architectural Review

13   Commission might have offended the members of the

14   Commission?

15        A.    At what point are you asking?    Did I

16   understand at what point?

17        Q.    At any point.

18        A.    I have never heard from any of those

19   members that they were offended by that

20   statement, or would have been.

21        Q.    Did you speak to any of the members

22   of the Commission?

23        A.    Not at that time.

24        Q.    Did you speak with any of them

25   subsequent to November of 2020?

182

1                    Elka Gotfryd

2          A.   I believe I had an interaction with

3    one of them, Chris Hansen, on Facebook at one

4    point.

5          Q.   Did the topic of your grant proposal

6    and its contents come up?

7          A.   No.

8          Q.   Okay.  Did you file some sort of

9    complaint with regard to this meeting that you

10   had with Ms. Church, or your interactions with

11   her around that time?

12              And that time being November or

13   December of 2020.

14         A.   Yes, I filed a complaint immediately

15   after that interaction.

16         Q.   Okay.  I'm going to hand you a

17   document which has been marked as Defendants'

18   Exhibit J.  It's a three page document.  I'll

19   just ask you to take a look at it, and let me

20   know when you've had a chance to do so.

21              (Document submitted.)

22         A.   Yes.

23         Q.   Okay.  Is this the complaint that

24   you filed?

25         A.   Yes.

183

1                    Elka Gotfryd

2        Q.   Okay.  And it's dated December 22nd

3   of 2020; is that right?

4        A.   That's correct.

5        Q.   And was this filed shortly after

6   this meeting that we've just spent a fair amount

7   of time talking about?

8        A.   This was filed immediately after

9   that.

10       Q.   Okay.

11       A.   It wasn't exactly a meeting.

12       Q.   Interaction.

13       A.   More accurate, thank you, yes.

14       Q.   Okay.  So, when you say,

15   immediately, was it filed on the same day or --

16       A.   No.

17       Q.   Okay.  Would it be fair to say it

18   was very close in time --

19       A.   Yes.

20       Q.   -- to whenever that interaction was?

21       A.   Yes.

22       Q.   Okay.  Great.

23            And this was also sent to Mr. Donat

24   and Ms. Kelson?

25       A.   That is correct.

184

1                    Elka Gotfryd
2      Q.    Now, I also see some new names on
3  the bottom.
4            I see Mr. Rauchet; right?
5            He's with the CSEA?
6      A.    Yes.
7      Q.    Who is Rebecca Blum, B-L-U-M?
8      A.    She  is --
9            MR. SUSSMAN:   Blum.
10           MR. MEHNERT:   Sorry.
11           THE WITNESS:   She's a regional --I
12     believe she's a regional -- she works at
13     the CSEA.
14           MR. MEHNERT:   Okay.
15           THE WITNESS:   Yeah.
16     Q.    So she works for the Union itself,
17  not for the City?
18     A.    Correct.
19     Q.    And I also see Mayor Torrance Harvey
20  listed on here; is that right?
21     A.    Correct.
22     Q.    And the ccs, how did they receive
23  that; by e-mail or some other way?
24     A.    I -- no, I printed out -- I believe
25  I printed this out and gave a signed copy to

185

Elka Gotfryd

1    Mr. Rauchet and Mayor Harvey.

3        Q.    Okay.   To your knowledge, did the

4    City respond to this letter in any way?

5        A.    There was -- yes.

6        Q.    And how did the City respond?

7        A.    They led an investigation.

8        Q.    And was that investigation also

9    performed by Dr. Coverdale?

10       A.    It was.

11             I'm also now realizing that I had

12   answered no to the previous time you asked that

13   question.

14       Q.    Okay.

15       A.    And I wish to clarify, for the

16   record, that, yes, they did respond.  My response

17   of no was, did they respond to the entirety of

18   the letter.

19       Q.    Okay.

20       A.    So I just wanted to have that on the

21   record, that I didn't mean to deny that they

22   conducted an investigation last time around.

23       Q.    Okay.  And in connection with the

24   investigation arising out of your December 22nd,

25   2020 letter, were you interviewed?

186

1              Elka Gotfryd

2        A.    I was.

3        Q.    And was anyone, besides yourself and

4   Dr. Coverdale, present for that interview?

5        A.    Yes.

6        Q.    And was it Mr. Rauchet?

7        A.    And Mr. Williams.

8        Q.    And Mr. Williams?

9        A.    Yes.

10        Q.    Okay.  And do you know what the

11   subject of Dr. Coverdale's investigation was?

12        A.    Just going back to your previous

13   question, I recall there was a meeting when

14   either Mr. Rauchet or Mr. Williams was not able

15   to attend, and I don't recall which meeting that

16   was.  Meaning --

17        Q.    Could you clarify what you mean by

18   that.

19        A.    Yes.  There were, as you now know,

20   several meetings with Dr. Coverdale.  I invited

21   both Dr. --  Mr. Rauchet and Mr. Williams to all

22   of them.  And I  -- I recall that one of them,

23   one of the represent- -- one of the Union

24   representatives was not in attendance.

25        Q.    Okay.

1               Elka Gotfryd

2          A.   And I don't recall which one that

3     was, which meeting that was.

4          Q.   Okay.  But at each of your various

5     interviews with Dr. Coverdale, there was some

6     Union representative who was present; is that

7     right?

8          A.   Correct.

9          Q.   Okay.  And do you know, with regard

10    to your December 22nd letter, what was it that

11    Dr. Coverdale was investigating?

12         A.    Item number two, whether Ms. Church

13    was in violation of the City's Violence

14    Prevention policy.

15         Q.   Okay.  And did you answer all of

16    Dr. Coverdale's questions?

17         A.    To the best of my knowledge and

18    understanding, yes.

19         Q.   And did he request any additional

20    information from you, that you recall?

21         A.   I do not recall.

22         Q.   Okay.  Assuming he did so, would you

23    have provided that information?

24         A.   Yes, sir.

25         Q.   Okay.  Was there anything you

188

1                     Elka Gotfryd

2    elected not to tell Dr. Coverdale, for whatever

3    reason?

4          A.    No, not intentionally, certainly.

5          Q.    And was there anything that you felt

6    that he left out, anything he didn't inquire

7    about, anything he didn't pursue with you?

8          A.    Not that I recall.

9          Q.    Okay.  Do you know who else was

10   interviewed in the course of that investigation?

11         A.    I don't know for sure, but I assume

12   Ms. Church.

13         Q.    And you were not present for any

14   other interviews; correct?

15         A.    I was not.

16         Q.    Okay.  To your knowledge, did

17   Dr. Coverdale produce a report at the close of

18   that investigation, or at the conclusion of that

19   investigation?

20         A.    Yes.

21         Q.    At the time that he concluded his

22   investigation, did you see a copy of his report?

23         A.    No.

24         Q.    Did you subsequently see a copy of

25   that report?

189

1                    Elka Gotfryd

2        A.    A redacted copy, yes.

3        Q.    Okay.  And was that in response to a

4   FOIL request that you or someone on your behalf

5   filed?

6        A.    Yes.

7        Q.    Okay.  Do you have a recollection of

8   having ever seen the unredacted version of the

9   report?

10       A.    Yes.

11       Q.    Okay.  And was that in connection

12  with this lawsuit?

13       A.    Yes.

14       Q.    Okay.  But going back to the time at

15  which this was going on, you did not see the

16  report; is that right?

17       A.    Correct.

18       Q.    Okay.  Did you receive some sort of

19  communication from the City with regard to the

20  conclusion of the investigation?

21       A.    Eventually.

22       Q.    Okay.  And what, if anything, did

23  that letter say?

24       A.    That my allegations were unfounded.

25       Q.    Okay.  And was it your understanding

190

1                    Elka Gotfryd
2     that Dr. Coverdale had concluded that the
3     allegations were unfounded?
4           A.    Yes.
5           Q.    And that the City had adopted his
6     findings?
7           A.    Yes.
8           Q.    Do you recall when you received that
9     communication, that the investigation had been
10    concluded?
11          A.    I believe it was in February of
12    2021.
13          Q.    Okay.
14          A.    I had to request it.
15          Q.    Okay.  And from whom did you request
16    it?
17          A.    I believe it was Ms. Diaz.
18          Q.    And who Ms. Diaz?
19          A.    She was the executive assistant.
20          Q.    Is that Eliana Diaz?
21          A.    Yes.
22          Q.    And she worked for the City Manager;
23    correct?
24          A.    Correct.
25          Q.    And at that time, you had not heard

191

1                     Elka Gotfryd

2    anything about what was going on with the

3    investigation?

4          A.    About either of the investigations.

5          Q.    And so that would have been the one

6    regarding your September 2020 letter, as well as

7    the December 2020 letter; correct?

8          A.    Correct.  I found out in a meeting

9    with Mr. Coverdale, for the second grievance,

10   that he had concluded his first investigation.

11         Q.    Okay.  And you had not received a

12   sort of follow-up letter; is that right?

13         A.    No, sir.  That's correct.

14         Q.    And after you spoke with Ms. Diaz,

15   did you subsequently receive letters regarding

16   both of these investigations?

17         A.    Yes.

18         Q.    Okay.  And I presume you did not

19   receive them on the same day; is that correct?

20         A.    I believe I did.

21         Q.    You did?

22         A.    Yes.

23               MR. MEHNERT:  Off the record.

24               (Whereupon, there was a discussion

25         held off the record.)

192

1                         Elka Gotfryd

2          Q.    Who is Elizabeth Zeldin?

3          A.    Elizabeth Zeldin works for

4    Enterprise.   It's a foundation, funding.

5          Q.    Foundation that does what?

6          A.    They fund various municipal

7    planning-related initiatives.   Community

8    oriented, economic development.

9          Q.    Did there come a time where you had

10   some communication with Ms. Zeldin about a grant

11   that you were working on, or some project you

12   were working on?

13         A.    Yes.

14         Q.    And what project were you working

15   on?

16         A.    Ms. Church had brought me on to a

17   group called the Anti-Displacement Learning

18   Network, ADLN, that Ms. Church -- sorry,

19   Ms. Cousins had been managing, but Ms. Cousins

20   had left.

21         Q.    When you say, Ms. Cousins had left,

22   left in what way?

23         A.    I don't recall if she was simply

24   working from home at the time, or if she had

25   already quit, but she was -- she may have been on

193

```
 1              Elka Gotfryd
 2   FMLA leave.  Some sort of leave.
 3        Q.   She was not at work; is it fair to
 4   say?
 5        A.   She was not at work.
 6        Q.   Okay.
 7        A.   And I remember that she -- she quit
 8   at some point in that time period.
 9        Q.   Okay.  And what was the
10   Anti-Displacement Learning Network?
11        A.   It was a -- a group of city
12   governments that had received a grant to
13   participate in a learning network that focused on
14   anti-displacement development strategies.
15        Q.   Okay.  And so Ms. Church brought you
16   in to replace Ms. Cousins, in terms of the
17   City's --
18        A.   Representation.
19        Q.   -- interaction with this learning
20   network?
21        A.   Yes.
22        Q.   Okay.  And Ms. Zeldin was also a
23   member of this group, or what was her role?
24        A.   Ms. Zeldin was one of the managers
25   of the -- of the program that granted the City of
```

194

1                    Elka Gotfryd
2    Newburgh, as well as the rest of the members of
3    this network.
4         Q.   Okay.
5         A.   So she was from the granting
6    organization.
7         Q.   Okay.
8         A.   I believe it's called Enterprise
9    Community Fund, or Enterprise Community
10   Foundation.  I don't recall exactly.
11        Q.   And how did it come to be that you
12   had some communication with Ms. Zeldin?
13        A.   Ms. Zeldin had mentioned on the call
14   that she was interested in -- I believe it was
15   about social impact bonds.  So it was a very
16   specific what I then believed to be quite a niche
17   concept in planning, that not many people were
18   talking about.  And she had said causally on the
19   call, if any of you are interested in exploring
20   this, let me know.  And I had been interested in
21   exploring that topic for quite sometime, and so I
22   had sent her a message on the Zoom chat, you
23   know, hi, I'm very interested in -- in talking
24   more about this.  She said, great.  Send me an
25   e-mail.  And so we corresponded and setup a time

195

```
 1                    Elka Gotfryd
 2   to talk about this, about this particular issue.
 3            Q.    Okay.  You said that this came up
 4   you were on a Zoom call with Ms. Zeldin; right?
 5            A.    With Ms. Zeldin and the ADLN, the
 6   learning network, members of the learning
 7   network.  So it was a big group call.
 8            Q.    And was anyone else from the City on
 9   that call, besides yourself?
10            A.    I don't recall.
11            Q.    Okay.
12            A.    Probably Ms. Church.
13            Q.    Okay.  And when you let Ms. Zeldin
14   know that you were interested in these social
15   impact bonds, were you letting her know that you
16   were interested on the City's behalf, or that you
17   were interested on your own behalf, from a
18   learning perspective?
19            A.    I did not mention the City's
20   interests.
21            Q.    Okay.  And what happened when the
22   two of you spoke, at whatever the designated time
23   was?
24            A.    We had a conversation about it.  It
25   became clear that she believed that I was
```

196

1            Elka Gotfryd

2   representing the City's interest with regards to

3   the ADLN.  I clarified that this was more of a

4   you know, as the City planner I'm interested in

5   exploring these channels, but that we already

6   have a program designated for the funds that we

7   had received.

8        Q.   And what happened next, in terms of

9   your conversation with Ms. Zeldin?

10       A.   Nothing.

11       Q.   Was that the end of the

12  conversation?

13       A.   Yeah.  I mean, I think we talked for

14  maybe half an hour, an hour.  It was just a very

15  kind of casual conversation.  And when I

16  understood that she thought that I wanted to talk

17  about this on behalf of the City's ADLN grant, I

18  just -- I wanted to make sure that she -- she

19  knew that this was coming from me specifically as

20  the City Planner, rather than me as a

21  representative of the ADLN.

22       Q.   Okay.  After that conversation, did

23  you bring Ms. Church up to speed on your

24  conversation?

25       A.   I did.

197

1              Elka Gotfryd

2         Q.    And when did you do that in relation

3    to the conversation?

4         A.    Almost immediately.

5         Q.    Okay.  And what did you tell

6    Ms. Church?

7         A.    I told her about the conversation,

8    and that I understood that there was a

9    miscommunication -- yeah, a miscommunication

10   about why I had reached out to Ms. Zeldin.  And

11   I just wanted to make sure that she knew I had

12   spoken with Ms. Zeldin, in case Ms. Zeldin

13   brought it up to her.

14        Q.    And how is it that you communicated

15   this to Ms. Church; was it in writing, was it

16   in-person?

17        A.    In-person.  I went into her office.

18        Q.    And what, if anything, did

19   Ms. Church say in response?

20        A.    She -- not much.  She asked if it

21   would be helpful if she would send any e-mail,

22   just thanking Elizabeth for her time.  I said,

23   yeah, that would be great.  She sent an e-mail to

24   Elizabeth.  Cc'ed me.  Elizabeth responding,

25   saying, no problem.  Sounds good.

198

1                    Elka Gotfryd
2           If I recall correctly, Ally thanked
3     her for her time and expressed to her --
4     expressed to Ms. Zeldin that I learned a lot from
5     her.  And she clarified again that the City had
6     intentions for the grant funds that were not
7     related to the conversation I had had with her.
8           Q.    That was Ms. Church was relaying
9     that information?
10          A.    Correct.
11          Q.    Okay.  The call that you had with
12    Ms. Zeldin, was there anyone else on that call,
13    besides you and she?
14          A.    Yes.
15          Q.    Who else was on that call?
16          A.    I don't remember her name.
17    Something like Jenny.  I -- something along those
18    lines.
19          Q.    Do you know what her purpose was on
20    that call?
21          A.    I -- I actually don't.
22          Q.    Do you know, was she with some
23    entity or group?
24          A.    She was also with Enterprise, I
25    believe.  And I think that was part of why I

199

1                          Elka Gotfryd
2      understood that Elizabeth thought that this was
3      within the context of the grant.
4              Q.    Okay.
5              A.    The fact that she had invited this
6      other colleague.
7              Q.    Okay.  Did you, during your
8      conversation with Ms. Church, did you apologize
9      to her for having engaged in that conversation
10     with Ms. Zeldin?
11             A.    I may have.
12             Q.    Did you indicate to Ms. Church that
13     you may have done something that you shouldn't
14     have?
15             A.    Possibly.
16             Q.    Had you been told, prior to this
17     call with Ms. Zeldin, to keep Ms. Church
18     up-to-date on these kinds of communications?
19             A.    What do you mean, these kinds of
20     communications?
21             Q.    Communications with outside vendors
22     with whom the City is dealing about funding
23     matters.
24             A.    As I had said earlier, I think I had
25     received some conflicting directives with regards

1                    Elka Gotfryd

2    to communications.

3         Q.    Had you received any directive to

4    pursue anything relating to the Anti-Displacement

5    Learning Network or the grant funds that were

6    received by the Learning Network for the City?

7         A.    No.

8         Q.    So you hadn't been told to reach out

9    to anybody?

10        A.    No.

11        Q.    You reached out to Ms. Zeldin on

12   your own?

13        A.    Correct.

14        Q.    After your conversation with

15   Ms. Church, did you speak with anyone else about

16   this communication you had with Ms. Zeldin?

17        A.    I don't believe so.

18        Q.    Were you ever questioned by anyone

19   with regard to that phone call?

20        A.    Yes.

21        Q.    And by whom were you questioned?

22        A.    Mr. Kaufman and Ms. Kelson.

23        Q.    And Mr. Kaufman is who?

24        A.    Assistant Corporation Counsel.

25        Q.    His first name is Jeremy; correct?

201

1                    Elka Gotfryd

2        A.    That's correct.

3        Q.    Okay.   And you said he and

4   Ms. Kelson?

5        A.    He asked the questions.   Ms. Kelson

6   was present in the room.

7        Q.    Okay.  And do you recall when it was

8   that you had the meeting with Mr. Kaufmann and

9   Ms. Kelson?

10       A.    Early March.

11       Q.    And what, if anything, did he --

12       A.    Of 2021.

13             MR. MEHNERT:   Strike that.

14       Q.    How did that meeting come about?

15       A.    I was invited.

16       Q.    By Mr. Kaufman?

17       A.    Mr. Kaufman I believe delivered a

18  formal invitation, letter.

19       Q.    Okay.  Was it an invitation or was

20  it a direction to appear?

21       A.    It was a direction to appear.

22       Q.    Okay.

23       A.    I believe the word invited may have

24  appeared in it, but...

25       Q.    You had an understanding that you

1                    Elka Gotfryd

2    were required to appear?

3         A.    Yes, sir.

4         Q.    Okay.  And besides Mr. Kaufman and

5    Ms. Kelson, was anyone else present?

6         A.    Yes.

7         Q.    Who else, besides those two and

8    yourself?

9         A.    One of my Union reps, if not both.

10        Q.    Do you have a recollection of which

11   one it was?

12        A.    I believe both of them were there.

13   Mr. Rauchet and --

14        Q.    Mr. Rauchet and Mr. Williams?

15        A.    -- and Mr. Williams, yes.

16        Q.    Okay.  And you said that Mr. Kaufman

17   was doing most of the questioning?

18        A.    Correct.

19        Q.    And what was it that he said at the

20   beginning of the meeting, if anything?

21        A.    Do you know why you're here.

22        Q.    And what did you say?

23        A.    No.

24        Q.    And  what was his response?

25        A.    I believe he started asking

203

                    Elka Gotfryd

1
2    questions.
3         Q.    And do you recall what he was asking
4    questions about?
5         A.    About my conversation with
6    Ms. Zeldin.
7         Q.    And --
8         A.    And my role on the ADLN team.
9         Q.    And did you answer all of his
10   questions?
11             MR. SUSSMAN:   As opposed to taking
12        the fifth.  That was a joke.
13             Did you answer all his questions?
14             THE WITNESS:  Yes, I did.
15        Q.    Did you leave any information out?
16        A.    No, not intentionally.
17        Q.    Okay.  Other than yourself and
18   Mr. Kaufman, did anybody else speak during the
19   course of the meeting?
20        A.    Yes.
21        Q.    And who else spoke?
22        A.    Ms. Kelson.
23        Q.    And what did Ms. Kelson say?
24        A.    Ms. Kelson responded to something I
25   said.

204

1                    Elka Gotfryd

2          Q.   Okay.  And what is it that

3     Ms. Kelson said?

4          A.   That I made Ms. Church go an extra

5     step for me.

6          Q.   And did you have an understanding of

7     what she meant by that?

8          A.   Yes.

9          Q.   And what did you understand that to

10    mean?

11         A.   That Ms. Church had to send a brief

12    e-mail to Ms. Zeldin.

13         Q.   That's the follow-up e-mail you

14    mentioned before?

15         A.   That's correct.

16         Q.   Sort of clarifying?

17         A.   Yes.

18         Q.   Okay.  What, if anything, else did

19    Ms. Kelson say?

20         A.   I don't recall.

21         Q.   Did anyone else speak during the

22    course of this meeting?

23         A.   Not that I recall.

24         Q.   Okay.  And how did the meeting come

25    to an end?

205

1                    Elka Gotfryd

2        A.    Could you clarify the question.

3        Q.    Mr. Kaufman finished his questioning

4   correct?

5        A.    Yes.

6        Q.    And when he was done with his

7   questions, did anything else happen?

8        A.    I turned to my Union reps and said,

9   it doesn't matter what I do.

10       Q.    Okay.  And you said that in front of

11  Mr. Kaufman and Ms. Kelson?

12       A.    I did.

13       Q.    And what, if anything, did they say

14  in response?

15             They being your Union reps.

16       A.    I don't think they said anything.

17       Q.    Did Ms. Kelson say anything in

18  response to that?

19       A.    No.

20       Q.    How about Mr. Kaufman?

21       A.    Not that I recall.

22       Q.    And did anything else happen at the

23  meeting, or did the meeting end at that point?

24       A.    I believe the meeting ended.

25       Q.    Okay.  Did you have any further

206

1              Elka Gotfryd
2    communication with Ms. Church about the
3    interaction with Ms. Zeldin --
4         A.   No.
5         Q.   -- after your meeting?
6         A.   No.
7         Q.   At some point thereafter your
8    employment with the City came to an end; is that
9    right?
10        A.   Correct.
11        Q.   And you were advised of that in a
12   meeting?
13        A.   Correct.
14        Q.   And who was present at the meeting,
15   besides yourself?
16        A.   Mr. Donat and Mr. Kaufman.
17        Q.   And do you recall when that meeting
18   took place?
19        A.   March 9th, 2021.
20        Q.   Okay.  And the meeting took place
21   where?
22        A.   In Mr. Donat's office, at City Hall.
23        Q.   Okay.  And when you arrived for the
24   meeting, were your Union representatives there?
25        A.   No.

207

1                    Elka Gotfryd

2        Q.    It was just you, Mr. Kaufman and

3   Mr. Donat?

4        A.    Correct.

5        Q.    And who spoke first?

6        A.    I believe it was Mr. Donat.

7        Q.    And what did he say?

8        A.    He handed me a letter and said, your

9   employment is terminated, effective immediately.

10       Q.    Did he say anything else at that

11  point?

12       A.    Not that I recall.

13       Q.    Did you say anything to him?

14       A.    Yes.

15       Q.    And what did you say?

16       A.    I believe I said, she doesn't even

17  have the guts to be here.

18       Q.    And who is the she to whom you were

19  referring?

20       A.    Ms. Church.

21       Q.    Did you say anything else?

22       A.    Not that I recall.

23       Q.    And did Mr. Donat respond to that

24  statement?

25       A.    Yes.

208

1               Elka Gotfryd

2        Q.    What did he say?

3        A.    I believe he said, we are not

4   obligated to respond to that.

5        Q.    Okay.  Did Mr. Kaufman say anything?

6        A.    Not that I recall.

7        Q.    Do you recall anything else that was

8   said by Mr. Donat during the course of this

9   meeting?

10       A.    No.

11       Q.    After he said that he was not

12  obligated to respond, did he say anything else?

13       A.    Good luck to you.  You know.

14  Wrapped it up.

15       Q.    Okay.  And Mr. Kaufman, did he say

16  anything during the course of this relatively

17  brief meeting?

18       A.    No.

19       Q.    Did you say anything else, besides

20  Ms. Church didn't have the guts to be there?

21       A.    Not that I recall.  Possibly, are

22  you serious.  I was quite surprised.

23       Q.    Do you have a recollection of the

24  date on which you had this meeting with

25  Mr. Kaufman and Ms. Kelson?

240

1                           Elka Gotfryd

2       realize any income?

3              A.    No.   I had a very supportive partner

4       and very supportive parents.

5              Q.    Okay.

6              A.    And some savings, luckily.

7              Q.    Okay.   In connection with this

8       lawsuit, are you seeking any damages as a result

9       of emotional distress, pain and suffering or

10      humiliation you say you suffered at the hands of

11      the Defendants?

12             A.    No, sir.

13             Q.    Okay.   Let me show you, referring to

14      Defendants' Exhibit A, which is your Complaint.

15                  (Document submitted.)

16             Q.    And there is a paragraph there on

17      that page that begins wherefore; do you see that?

18             A.    Uh-huh.

19             Q.    You have to say, yes.

20             A.    Oh.   Yes.   Sorry.

21             Q.    You're fine.   You've been very good

22      about it.

23                  In that paragraph there is a

24      Section C that begins at the end of the second

25      line; do you see that?

241

1              Elka Gotfryd

2         A.    I do.

3         Q.    All right.  And am I correct that in

4    there it acts the court to award compensatory

5    damages, including back and front pay and damages

6    for emotional distress, pain and suffering and

7    humiliation?

8         A.    That is what it says, yes.

9         Q.    Okay.  But you are now no longer

10   seeking those damages?

11        A.    That's correct.

12        Q.    And why are you no longer seeking

13   those damages?

14        A.    I believe this --

15             MR. SUSSMAN:   I don't think you

16        have to really answer why she's not

17        seeking them.  She's not seeking them.

18        We'll so stipulate.  I don't think she has

19        to tell you why she's not.

20             MR. MEHNERT:  All right.  Fair

21        enough.  I want to just establish --

22        because it's in the Complaint and I know

23        what the Discovery says --

24             MR. SUSSMAN:   It's so stipulated.

25             MR. MEHNERT:  -- I just want to be

242

1                    Elka Gotfryd

2         clear.  Okay.

3              So it's not something that you are

4         seeking?

5              MR. SUSSMAN:    No.

6              MR. MEHNERT:  Okay.  We don't need

7         this.  Okay.

8         Q.    Am I correct that you are seeking

9    the reimbursement of legal fees in connection

10   with this lawsuit?

11        A.    Yes, sir.

12        Q.    Have you had to pay any legal fees

13   out-of-pocket to date?

14        A.    Yes.

15        Q.    How much?

16        A.    $2,000.

17        Q.    Okay.  And do you have any

18   outstanding invoices that you have not yet paid?

19        A.    No.

20        Q.    Okay.

21        A.    Not yet, anyway.

22        Q.    As we sit here today, the answer's

23   no?

24        A.    The answer is no today, that's

25   correct.

244

STATE OF NEW YORK )

COUNTY OF_____)


I have read the transcript of my testimony

taken at the time and place noted on the

title page, and I acknowledge it to be true

and correct.  Any and all corrections will

be put on the errata sheet included at the

end of this transcript.



                    _____

                         Elka Gotfryd



Sworn or affirmed to before me this

_____day of_____20____

_____

Notary Public

247

C E R T I F I C A T I O N

I, Jacqueline Padilla, a Certified

Shorthand Reporter, Registered

Professional Reporter and Notary Public

within and for the State of New York,

hereby certify:

That the witness whose examination

is hereinbefore set forth was duly sworn

or affirmed by a Notary Public and that

the transcript of said examination is a

true record of the testimony given by said

witness; and

That I am not related to any of the

parties to this action by blood or

marriage, and I am in no way interested in

the outcome of this matter.

Jacqueline Padilla, CSR, RPR