# EXHIBIT Q

# CONFIDENTIAL INVESTIGATION REPORT
December 21st, 2020

**MATTER:** Elka Gotfryd: Complainant

**INVESTIGATOR:** Dr. John Coverdale
The Center for Workplace *Solutions*, Inc.
850-170 Montauk Highway
Bayport, N.Y. 11705
john@centerforworkplacesolutions.com

**NATURE OF COMPLAINT:**

In an email dated September 21st, 2020, Elka Gotfryd, an eight-month employee of the City of Newburgh, requested the dismissal of her September 3rd work performance review. Ms. Gotfryd alleges that the performance review conducted by Alexandra Church, her immediate supervisor, contains a "number of inaccuracies," and included a "number of issues that were found to be moot" during a review meeting that took place on August 25th, 2020. Ms. Gotfryd asserts that Ms. Church's evaluation of her work is "retaliatory in nature," and "a response to my whistle-blowing within the department regarding implicit bias and racism, as well as my repeated complaints of hostile treatment."

Ms. Gotfryd further asserts that Ms. Church's "misrepresentation and manipulation of events, inaccurate and misleading accounts of events, mischaracterization and exploitation of gender stereotypes, and hostility, beratement, and belittlement," constitute a violation of the following City of Newburgh polices:

- Section 65-12 of the City of Newburgh's Workplace Violence Prevention Policy.
- Section 34-20.A of the City of Newburgh's Equal Opportunity Employment and Anti-Harassment Policy.
- Section 34-4.8 of the City of Newburgh's Code of Ethics.

While meeting with me on October 7th, Ms. Gotfryd amended her complaint to include the following:

- Section 65-10 of the City of Newburgh's Workplace Violence Prevention Policy.
- Section 34-18 of the City of Newburgh's Equal Opportunity Employment and Anti-Harassment Policy.

**INTERVIEW SCHEDULE:**

October 7th, 2020: Elka Gotfryd (attended with union President Michael Rauchet and Vice President Maurice Williams)
October 7th, 2020: Alexandra Church
October 20th, 2020: Ellen Fillo
October 20th, 2020: Lisa Ross
October 20th, 2020: Chief Horton
October 21st, 2020: Erin Cousins (Via phone)

**RESTRICTIONS ON INTERVIEWS:**

The City of Newburgh placed no limits on any interview, either in the scope of questioning or time allotted, and no employee or witness was restricted from being interviewed. There was unlimited access to all personnel during the interview process, and all witnesses fully cooperated with the interviews and scheduling. All interviews took place at City Hall, except for Erin Cousins, who was interviewed by phone.

**PRELIMINARY STATEMENT:**

In addition to explaining the need for confidentiality, the following initial statement was read to each interviewee in substantially the same form that follows: My name is John Coverdale, I am a Human Resource Management consultant and an independent investigator from the Center for Workplace *Solutions,* and I have been hired by the City to investigate claims of workplace violence, and hostility, as well as other possible violations of City policy, and I would like to ask you some questions about this matter. Interviewees were then asked if they had any concerns or questions before I proceeded.

**RELEVANT POLICIES:**

- City of Newburgh Equal Opportunity and Anti-Harassment Policy, adopted April 13th, 2015.
- City of Newburgh Workplace Violence Prevention, adopted August 10th, 2009, amended in its entirety on December 10th, 2012.
- City of Newburgh Code of Ethics, added April 13th, 2015

3

**EVIDENCE/DOCUMENTS REVIEWED:**

Letter Ms. Gotfryd sent to Mr. Donat and Ms. Kelson dated September 21st, 2020, outlining her complaint.

Email Ms. Gotfryd sent to Ms. Church dated February 25th, 2020.

Email Ms. Gotfryd sent to Ms. Church dated June 4th, which Ms. Church shared with Mr. Donat.

Emails Ms. Church sent to Stanley Merritt dated June 10th, June 18th, and July 31st, 2020

Email Ms. Church sent to Joseph Donat dated August 11th, 2020.

Information Ms. Gotfryd submitted, which she described as a timeline of Ms. Church's retaliatory actions, consisting of the following:

June 8th, 2020 agenda, and materials sent to participants for the Housing Coalition meeting.

June 9th, 2020 email in which Ms. Church requested to meet with her, and Ms. Gotfryd's follow-up dated June 11th, 2020.

Emails dated July 13th exchanged between Ms. Church and Ms. Gotfryd regarding the use of the term "anti-racism," and the Housing study consultant.

Emails between August 3rd and August 10th in which Ms. Gotfryd expressed concern to Ms. Church about the Cities Rise program.

**SUMMARY OF INTERVIEWS:**

**Elka Gotfryd:**

Ms. Gotfryd alleges that Alexandra Church, her immediate supervisor, "lied" on her September 3rd performance review. Ms. Gotfryd further asserts that Ms. Church is retaliating against her for an array of reasons, which Ms. Gotfryd summarized as her strong opposition to racism, questioning of departmental practices and policies, general assertiveness, and a harassment complaint filed by Erin Cousins, which Ms. Gotfryd believes was driven by Ms. Church's providing Ms. Cousins with the relevant City of Newburgh policy on which to base her complaint and suggesting language for Ms. Cousins to use in her complaint.

Ms. Gotfryd, in support of her retaliation claim, provided a written timeframe consisting of events that allegedly occurred between June 3rd and September 3rd, 2020, and highlights the following incidents:

4

- A June 8th email Ms. Church sent asking her to make sure all materials/memos she sends are shown to her before sending them out.
- A June 9th email in which Ms. Church requested to meet with Ms. Gotfryd on June 10th. Ms. Gotfryd alleges that from the start of the June 10th meeting, she was "met with unwarranted hostility and beratement." She further alleges that during the meeting, Ms. Church raised her voice, criticized her methodology for achieving the work product (William Street map), said she didn't know what she was doing, and accused her of missing deadlines. Ms. Gotfryd alleged that via email, she contacted Ms. Church the next day and requested a follow-up meeting to "improve our work dynamic," but Ms. Church never responded. Ms. Gotfryd further notes that Ms. Church has denied that she had ever been hostile to her and included this self-assessment in Ms. Gotfryd's September 3rd performance review.
- A July 10th meeting with Ms. Church that took place in Ms. Gotfryd's office, during which Ms. Church is alleged to have told Ms. Gotfryd that she lacked facilitation skills, took over a meeting that wasn't hers, and directed her to not use the term anti-racism in a memo dated June 8th.
- Emails between Ms. Gotfryd and Ms. Church, dated between July 13th and September 3rd focusing on role conflict, programs within the department, accusations of racism, and the race-based impact of some housing programs, her August 3rd email to Ms. Cousins that became the center of an allegation that Ms. Gotfryd was harassing Ms. Cousins, and lead to an investigation, and meetings between Ms. Gotfryd, Ms. Church, and other City officials regarding Ms. Gotfryd's work performance/evaluation.

Ms. Gotfryd specifically identified an August 24th incident, which she said occurred in the office Ms. Church shares with Chief Horton, which she noted Ms. Church alludes to in the performance evaluation, citing it as proof of her "aggressive tone." Ms. Gotfryd also alleges that during the August 25th meeting she attended, at which Ms. Church, Stan Merritt, and union representatives Michael Rauchet and Maurice Williams were also present, Ms. Church accused her of "provoking" Chief Horton when she approached to ask him a question.

Ms. Gotfryd described her work relationship with Ms. Church as "an ongoing struggle," and cites the tone and content of the August 25th meeting, as well as her September 3rd written evaluation, as causation for her filing what she described to me as a "grievance" to have the evaluation Ms. Church conducted dismissed, because of its "inaccurate content," and "punitive tone," and "misrepresentation" of her work performance.

Ms. Gotfryd informed me that because of the personal relationship she believes Ms. Church has with Mr. Horton; she felt it was necessary to share her concerns regarding the August 24th incident and the August 25th meeting she had with her union representatives, Ms. Church and Mr. Merritt; with Jeremy Kaufman, a member of the City's legal counsel. According to Ms. Gotfryd, when Ms. Church found out that she had spoken with Mr. Kaufman, she cited this as another example of her "aggression." Ms. Gotfryd believes that in general, Ms. Church's assessment of her is a "manipulation of events in support of her mischaracterization of my behavior. This misrepresentation and her defense of chief Horton was not only inappropriate within the context of my performance review, but hostile and threatening toward me and demonstrated a conflict of interest." Ms. Gotfryd, in reviewing the Employee Counseling Form she received, cites Ms. Church's references to her relationships with co-workers, and explicitly identifies the comment that "discussions on co-worker projects, tasks, or programs are often phrased argumentatively, combative, or aggressive tone used, and then apologized for later," as constituting a form of gender-based discrimination by Ms. Church, who Ms. Gotfryd also alleges "treats women differently than men." Ms. Gotfryd informed me that she has witnesses who will attest to Ms. Church's conduct. Ms. Gotfryd did not address any other aspects of her Employee Counseling Form, which identified deficiencies in Time and Attendance, Work Performance, Interpersonal Communications, and included a corrective action plan.

**Alexandra Church:**
Alexandra Church stated that she was surprised to learn that Ms. Gotfryd had filed a complaint, adding that she thought their relationship had improved since September 3rd, basing her assessment on the fact that Ms. Gotfryd was "communicating better, arriving to work on time,

6

and not disappearing as much." She confirmed her participation in the August 25th meeting with Ms. Gotfryd, at which Stan Merritt, Ms. Gotfryd's union representatives, Michael Rauchet, and Maurice Williams, were also present. I showed Ms. Church a copy of Ms. Gotfryd's September 3rd evaluation, and she confirmed that she had authored it, was familiar with its contents, and still believes it to be a fair and complete assessment of Ms. Gotfryd's work. Ms. Church confirmed that on August 24th, while in the office she and Chief Horton share, Ms. Gotfryd came in and "quickly and loudly said hey Chief you gotta do the information for 405 Grant St., they've been waiting." According to Ms. Church, Chief Horton was "already angry about something" when Ms. Gotfryd came into the office, and she provided that Chief Horton's reply was "they can wait." When asked to describe the tone Chief Horton used in his response, Ms. Church provided that he responded to Ms. Gotfryd in a "mirrored tone."

Ms. Church acknowledged that she and Ms. Gotfryd have raised their voices when speaking with each other, including during the August 25th meeting, which Ms. Gotfryd said lead her to file this complaint. Ms. Church denied that she has ever been hostile to Ms. Gotfryd or that her interactions with Ms. Gotfryd should cause discomfort. Ms. Church also denies that she is retaliating against Ms. Gotfryd. Ms. Church confirmed that she did meet with Erin Cousins, who came to her office after reading an email Ms. Gotfryd sent to both Ms. Cousins and Ms. Gotfryd. However, she was adamant in denying that she did or said anything to encourage Ms. Cousins to pursue a complaint against Ms. Gotfryd, stating that she only went over the relevant policies with Ms. Cousins, believing that to be a part of her role as a manager when an employee approaches her with a problem or concern.

**Ellen Fillo:**

Ms. Fillo is a witness provided by Ms. Gotfryd. She stated that she had little to no direct knowledge about the ongoing conflicts between Ms. Church and Ms. Gotfryd but does have "an awareness that something isn't right." Ms. Fillo then opened a small notebook and cited an incident that she said occurred at 3:30 pm on August 10th, 2020, when Ms. Church came into her office and advised her to "start documenting conversations with Elka, she is misrepresenting the facts." According to Ms. Fillo, Ms. Church is now "civil" to her, but "prior to

Elka's grievance she would walk right past my office every day without saying hello." Ms. Fillo described her work environment as "horrible," adding that her level of discomfort is such that she doesn't bring anything to work because "I always feel I'm gonna be escorted out of the building."

When asked, Ms. Fillo provided that she does believe Ms. Church treats the men she supervises more favorably than the women but did not give any specifics.

### Lisa Ross:

Ms. Ross is a witness provided by Ms. Gotfryd. She stated that she has no direct knowledge of any issues between Ms. Church and Ms. Gotfryd. When asked if she knew why Ms. Gotfryd provided her name as a witness; she offered that her relationship with Ms. Church is "civil and professional," but added that she had had problems with Ms. Church in the past, and she did hear about the incident involving Ms. Gotfryd, that took place in the office Mr. Horton and Ms. Church share, but did not witness it directly.

When asked, Ms. Ross provided that she does believe Ms. Church treats the men she supervises more favorably than the women.

### Chief Horton:

Chief Horton confirmed that he knows Ms. Gotfryd but initially stated that he could not recall the August 24th incident Ms. Gotfryd included in her complaint, adding that there have been "several negative conversations with Elka." After I refreshed his memory, Mr. Horton, now able to recall the incident, stated that on the day in question, "Elka was pushing me for an answer." Asked to elaborate, Mr. Horton said, "I was having a very bad day and Elka wouldn't disengage." Mr. Horton added, "her request wasn't a priority, Elka wanted a site visit, I recall saying I'm not dealing with this today. I don't recall whether Elka responded, and I left the office to get away." Mr. Horton added, "I was loud but didn't yell." On a scale of one to ten, I asked Mr. Horton how loudly he spoke, and he said, "five." Continuing, Mr. Horton stated that "Elka might have been startled that I left the office." Mr. Horton further commented, "I don't see eye to eye with Elka, I don't speak to Elka at all." When asked what lead to his decision to stop speaking to Ms.

Gotfryd, Mr. Horton could not recite a specific incident, but he did say, "it was a poor decision, but I'm not changing it."

Mr. Horton said of the August 24th incident, "Elka's style and mannerism is brusque, but she never raised her voice that day." Mr. Horton confirmed that he left the office "in frustration," but that his state of mind had "nothing to do with Elka, she just happened to walk in at a bad time." Mr. Horton added that after the August 24th incident, he took one week off to determine "whether to remain employed here."

**Erin Cousins:**

Ms. Cousins is a witness provided by Ms. Gotfryd. She stated that sometime in early October, she received a call from Ms. Gotfryd, who asked her if she could use her name as a witness to the relationship difficulties she was experiencing with Ms. Church. According to Ms. Cousins, during that conversation, the two also discussed the recent complaint Ms. Cousins had filed against Ms. Gotfryd. Ms. Cousins confirmed that she informed Ms. Gotfryd that elements of her conversation with Ms. Church in the immediate aftermath of reading the email Ms. Gotfryd sent her, on which Ms. Church was copied, did help shape the harassment complaint she filed. Ms. Cousins pointedly informed me that Ms. Church neither encouraged nor forced her to file the complaint against Ms. Gotfryd. However, in retrospect, she feels that Ms. Church could have done more to address the ongoing conflicts that lead up to her filing the complaint against Ms. Gotfryd. Ms. Cousins was emphatic in stating that she was in no way "reneging" on her allegations against Ms. Gotfryd, but she now believes that the matter "escalated in a way that was perhaps avoidable." Ms. Cousins further stated, referring to her filing the complaint, that she "can't make a conclusion as to what caused Allie to give me the advice, but Allie said here is the tool to resolve that matter and I followed the advice I received."

Ms. Cousins stated that while she has "no problems with Allie, there is definitely tension between Allie and Elka, and has been from the beginning."

When asked, Ms. Cousins provided that she does not believe Ms. Church treats the men she supervises more favorably than the women.

Newburgh 000375

**ANALYSIS:**

In an email dated September 21st, 2020, Elka Gotfryd requested that her September 3rd performance review, conducted by Alexandra Church, her immediate supervisor, be dismissed due to the "number of inaccuracies," and the "number of issues that were found to be moot" during a meeting that took place on August 25th, 2020. Ms. Gotfryd asserts that Ms. Church's evaluation of her work is "retaliatory in nature," and "a response to my whistle-blowing within the department regarding implicit bias and racism, as well as my repeated complaints of hostile treatment."

Ms. Gotfryd asserts that Ms. Church's "misrepresentation and manipulation of events, inaccurate and misleading accounts of events, mischaracterization and exploitation of gender stereotypes, and hostility, beratement, and belittlement."

Ms. Gotfryd believes Ms. Church to be in violation of the following policies:
1) Sections 34-18 and 34-20. A.1 of the City of Newburgh's Equal Employment Opportunity and Anti-Harassment Policy. Added April 13th, 2015.
2) Sections 65-10 and 65-12 of the City of Newburgh's Workplace Violence Prevention. Adopted August 10th, 2009, amended in its entirety on December 10th, 2012.
3) Section 34-4.8 of the City of Newburgh's Code of Ethics, added April 13th, 2015

**Section 34-18 of the City's Equal Employment Opportunity and Anti-Harassment Policy** addresses individuals and conduct and confirms that the policy applies to Ms. Gotfryd and Ms. Church, as employees of the City of Newburgh.

**Section 34-20. A.1 of the City's Equal Employment Opportunity and Anti-Harassment policy states the following:**

Harassment based on any protected characteristics.
- A. Harassment on the basis of any protected characteristics is strictly prohibited by the City.
    1) "pursuant to this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, creed, gender, national origin, age, disability, marital status, citizenship

10

status, military or veteran status, sexual orientation, genetic information, or any other characteristic protected by applicable law and that:
(a) Has the purpose or effect of creating an intimidating, or hostile work environment;
(b) Has the purpose and effect of unreasonably interfering with an individual's work performance; or
(c) Otherwise adversely affects an individual's employment opportunities."

**The City's Equal Employment Opportunity and Anti-Harassment Policy** further states: "Harassing conduct includes, but is not limited to: epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group (including through email)."

**Section 65-10 of the City of Newburgh's Workplace Violence Prevention Policy** is a general policy statement leading to the more relevant content, which defines violence and or workplace violence as: "any physical assault, acts of aggressive behavior including but not limited to verbal threats, displays of force, stalking or other threatening behavior that reasonably rises to the level of perception of potential violence occurring in the workplace, including with or without the use of any means, weapon or instrumentality." The policy further defines threatening or non-emergency as "a person, through intimidating words or gestures, has induced fear and apprehension of physical or harm in another person, but there is no immediate danger of such harm being inflicted." **Section 65-12** of the policy explicitly prohibits the following activities:

A) Verbal or physical conduct that demonstrates explicit or implicit ridicule, mockery, derision, or belittlement of any person.

B) Any offensive or derogatory remarks based on race, color, sex, age, religion, sexual orientation or preference or national origin, either directly or indirectly, to another person. Such harassment is a prohibited form of discrimination under state and federal employment law.

C) Any verbal or physical conduct that has the purpose or effect of substantially interfering with the employee's ability to do his or her job.

D) Any verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

E) Intentional physical contact for the purpose of causing harm, such as but not limited to slamming, stabbing, punching, striking, shoving, or other physical attack.

Newburgh 000377

F) Menacing or threatening behavior, such as but not limited to throwing objects, pounding on a desk or door, damaging property, stalking or otherwise acting aggressively, or making oral or written statements specifically intended to frighten, coerce or threaten, where a reasonable person would interpret such behavior as constituting evidence of intent to cause harm to individuals or property.

G) Possession of firearms, imitation firearms, knives, or other dangerous weapons, including but not limited to chemical/biological weapons, instruments, or materials, except as permitted by law, rule, or regulation.

**Section 34-4.8 of the City of Newburgh's Code of Ethics,** addresses the Use of Municipal Resources. **Section A.** Municipal resources shall be used for lawful municipal purposes. Municipal resources include, but are not limited to, municipal personnel and the municipality's money, vehicles, equipment, materials, supplies or other property.

1) Pertaining to Ms. Gotfryd's allegation that Ms. Church violated her rights as contained in Sections 34-18 and 34-20. A.1 of the City of Newburgh's Equal Employment Opportunity and Anti-Harassment Policy, while it is clear that Ms. Gotfryd and Ms. Church do not work well together, this investigation did not find that Ms. Gotfryd was being harassed based on gender or any other protected characteristics. Despite the at times disconcerting verbal and electronic exchanges in which both individuals appear to partake willingly, and at times escalate needlessly, Ms. Church has not engaged in conduct that rises to the level of harassment or that "denigrates or shows hostility or aversion toward" Ms. Gotfryd.

This investigation also did not find that the ongoing negativity between Ms. Gotfryd and Ms. Church created an "intimidating, or hostile work environment," had the "purpose or effect of unreasonably interfering with an individual's work performance," or "otherwise adversely affects an individual's employment opportunities." However, here it must be noted that Ms. Gotfryd does hold firmly and did express the belief that Ms. Church is actively engaging in an ongoing attempt to justify the termination of her employment. Ms. Gotfryd cites the August 24th incident with Chief Horton as proof of

how far Ms. Church will go to mischaracterize her actions, adding that the incident was discussed during their meeting on August 25th. While there exists no specific reference to the incident within the Employee Counseling Form itself, Ms. Gotfryd believes, nonetheless, that the incident is referenced in Section C: Co-Workers, which states "discussions on Co-workers projects, tasks, or programs are often phrased argumentatively, combative, or aggressive tone used, and then apologized for later." While meeting with me, Ms. Church did not recite any other incidents Ms. Gotfryd was involved in, to which she attributed this conduct, and Ms. Gotfryd claimed to have never engaged in such behavior while describing her disposition as she approached Chief Horton that day as "respectful and cheerful." Conversely, when meeting with me, Ms. Church described Mr. Horton as "already angry about something when Elka came in quickly and loudly," further adding that in responding to Ms. Gotfryd, Chief Horton "mirrored her tone." However, when I asked Chief Horton to describe the incident, he initially said he didn't recall it, but upon refreshing his recollection, he then provided that he was having a bad day and he confirmed critical aspects of the incident, yet, he differed considerably from Ms. Church in stating that "Elka's style and mannerism is brusque, but she never raised her voice that day."

2) Pertaining to Ms. Gotfryd's allegation that Ms. Church violated her rights as contained in Sections 65-10 and 65-12 of the City of Newburgh's Workplace Violence Prevention, this investigation did not find that Ms. Church subjected Ms. Gotfryd to "any physical assault, acts of aggressive behavior including but not limited to verbal threats, displays of force, stalking or other threatening behavior that reasonably rises to the level of perception of potential violence occurring in the workplace, including with or without the use of any means, weapon or instrumentality." Nor, as the policy further defines, a threatening or non-emergency such as "a person, through intimidating words or gestures, has induced fear and apprehension of physical or harm in another person, but there is no immediate danger of such harm being inflicted."

13

Newburgh 000379

This investigation also did not find that Ms. Church violated any of Ms. Gotfryd's rights as delineated in **Section 65-12** of the policy, which explicitly prohibits the activities mentioned above.

3) Pertaining to Ms. Gotfryd's allegation that Ms. Church violated her rights as contained in Section 34-4.8 of the City of Newburgh's Code of Ethics, this investigation did not find that Ms. Church misused municipal resources, "municipal personnel, the municipality's money, vehicles, equipment, materials, supplies or other property."

SUMMARY:

I hereby determine that none of the allegations contained in Ms. Gotfryd's September 21st complaint constitute a violation of the City of Newburgh's policies or subsections identified within. Similarly, this investigation did not find Ms. Church's conduct to be retaliatory in nature, or, as alleged by Ms. Gotfryd, "a response to my whistle-blowing within the department regarding implicit bias and racism, as well as my repeated complaints of hostile treatment," none of which Ms. Gotfryd substantiated during this investigation. While it is clear that the two have an ongoing conflict in general, and they specifically appear to conflict over things like the use of the term "anti-racism," and Ms. Gotfryd's apparent discomfort with some of the City of Newburgh's housing policies, I believe that the tension which exists within their professional relationship stems more from Ms. Gotfryd's at times unbridled passion and what appears to be a sense of entitlement, as well as Ms. Church's real, and at times, imagined concerns over Ms. Gotfryd's work style and approach.

To the extent that Ms. Gotfryd's September 3rd Employee Counseling Form may have, as she alleges, mischaracterized her work and or performance or contained demonstrable falsehoods, I leave these questions to the discretion of the City of Newburgh's management and Ms. Gotfryd's rights under the rebuttal process.

*[signature]*

Dr. John W. Coverdale, Investigator
The Center for Workplace *Solutions* Inc.
December 21st, 2020