**EXHIBIT U**

# CONFIDENTIAL INVESTIGATION REPORT

January 28th, 2021

**MATTER:** Elka Gotfryd: Complainant

**INVESTIGATOR:** Dr. John Coverdale
The Center for Workplace *Solutions*, Inc.
850-170 Montauk Highway
Bayport, N.Y. 11705
john@centerforworkplacesolutions.com

NATURE OF COMPLAINT:

In a letter dated December 22nd, 2020, Elka Gotfryd, an employee of the City of Newburgh, alleged that Alexandra Church, her immediate supervisor, engaged in a hostile manner towards her on the morning of December 22nd. Specifically, Ms. Gotfryd asserts that Ms. Church made "berating comments regarding my character and the quality of my work," which "constitute hostility and belittlement." Ms. Gotfryd further alleges that Ms. Church is "obstructing my ability to perform my work duties as a civil servant with integrity as she has instructed me to omit a key fact in framing this work." Ms. Gotfryd asserts that the incident on December 22nd "illustrates a pattern of Ms. Church's contradictory directives and gas lighting," and that the incident is "evidence of Ms. Church's implicit bias as well as her retaliation against me." Ms. Gotfryd believes that Ms. Church's conduct violates the following City of Newburgh polices:

- Section 65-12 of the City of Newburgh's Workplace Violence Prevention Policy, and subsections A, C, D of the policy.

While meeting with me on January 5th, 2021, Ms. Gotfryd amended her complaint to include the following:

- Section 34-18 of the City of Newburgh's Equal Opportunity Employment and Anti-Harassment Policy.
- Section 34-20. A of the City of Newburgh's Equal Opportunity Employment and Anti-Harassment Policy.

INTERVIEW SCHEDULE:

January 5th, 2021: Elka Gotfryd (attended with union President Michael Rauchet and Vice President Maurice Williams)
January 5th, 2021: Alexandra Church
January 6th, 2021: Tara Miller (via phone)
January 8th, 2021: Tara Miller (via phone)

Newburgh 000389

**RESTRICTIONS ON INTERVIEWS:**

The City of Newburgh placed no limits on any interview, either in the scope of questioning or time allotted, and no employee or witness was restricted from being interviewed. There was unlimited access to all personnel during the interview process, and all witnesses fully cooperated with the interviews and scheduling. All interviews took place at City Hall, except for Tara Miller, who was interviewed by phone.

**PRELIMINARY STATEMENT:**

In addition to explaining the need for confidentiality, the following initial statement was read to each interviewee in substantially the same form that follows: My name is John Coverdale, I am a Human Resource Management consultant and an independent investigator from the Center for Workplace *Solutions,* and the City has hired me to investigate claims of workplace violence, and hostility, as well as other possible violations of City policy, and I would like to ask you some questions about this matter. Interviewees were then asked if they had any concerns or questions before I proceeded.

**RELEVANT POLICIES:**

- City of Newburgh Equal Opportunity and Anti-Harassment Policy, adopted April 13th, 2015.
- City of Newburgh Workplace Violence Prevention, adopted August 10th, 2009, amended in its entirety on December 10th, 2012.

EVIDENCE/DOCUMENTS REVIEWED:

- Letter Ms. Gotfryd sent to Mr. Donat and Ms. Kelson dated December 22nd, 2020, outlining her complaint.
- Email Ms. Church sent to Mr. Donat and Ms. Kelson dated December 22nd, 2020, outlining the incident between her and Ms. Gotfryd on the morning of December 22nd.
- Emails dated December 22nd, 2020, exchanged between Ms. Gotfryd and Ms. Church regarding the American Civil Rights History Grant.
- Emails Ms. Gotfryd sent to me dated January 6th and 7th, 2021, which she believed to be pertinent to this investigation, including the letter of support from Congressman Maloney's office.

SUMMARY OF INTERVIEWS:

Elka Gotfryd:

Ms. Gotfryd alleges that on the morning of December 22nd, Alexandra Church, her immediate supervisor, acted in a way which she asserts left her feeling "berated." Ms. Gotfryd further alleged that during this incident, Ms. Church questioned her character and the quality of her work, which left Ms. Gotfryd feeling that she had been treated in a hostile and belittling fashion by Ms. Church.

Ms. Gotfryd further alleges that Ms. Church is "obstructing" her ability to perform her work duties with integrity and that Ms. Church is exhibiting "implicit bias" and "retaliation" against her, stemming from a prior complaint Ms. Gotfryd filed against her.

While meeting with me, Ms. Gotfryd provided that the December 22nd incident between her and Ms. Gotfryd stemmed from a grant she had been working on since the middle of November 2020, which she had received Ms. Church's approval to pursue. Ms. Gotfryd stated that in early December, she met with Ms. Church to discuss the grant's application status, and informed me that she felt the meeting was "very good," adding that she thought Ms. Church gave her "some good guidance," but never specifically told her to run internal or external emails by her so she could review them before being sent out. According to Ms. Gotfryd, on the morning of

4

December 22nd, she approached Ms. Church to request her assistance with reaching someone in Congressman Maloney's office since she had not been able to do so, and the grant application required a letter of support from the Congressman. Ms. Gotfryd provided that immediately upon entering Ms. Church's office, she had a sense that Ms. Gotfryd "was not in a good mood," adding that her initial assessment was confirmed when she said good morning, and alleges that Ms. Church's reply to her was "what is it?" Ms. Gotfryd further provided that immediately upon informing Ms. Church of her needs, Ms. Church said, "you can't reach out to Maloney's office." Ms. Gotfryd provided that her response to Ms. Church was "you told me I could proceed with the application," to which Ms. Church replied, "I shouldn't have said that," and directed Ms. Gotfryd to send her any communications related to her work on the grant application, which she did. Ms. Gotfryd provided that within a few minutes, Ms. Church approached her with what she described to me as "an air of heatedness," and said, "you can't say this about the City, and you need to run things by me before hand," then walked away. Ms. Gotfryd then stated that she wasn't exactly sure what Ms. Church meant, so she went to her office a few minutes later to discuss the matter further. During this conversation, Ms. Church told her that she didn't want her pointing out that the Architectural Review Commission (ARC) is all White, and accused Ms. Gotfryd of "opening the City up to a discrimination lawsuit," and she repeatedly stated that Ms. Gotfryd needed to run things by her. According to Ms. Gotfryd, their conversation "escalated" at this point because "Ally belittled me and I became agitated." When asked to describe her conduct during this point in the discussion, Ms. Gotfryd acknowledged that she raised her voice, estimating that on a scale of one to ten, she reached five or six, especially while informing Ms. Church that she didn't trust her and telling her that she was going to start to "record everything from now on," to which she says Ms. Church yelled, "no you're not." Ms. Gotfryd further provided that within a minute after her exchange with Ms. Church ended, she became emotional in close proximity to a few of her colleagues and stated, although to no one in particular, "I'm tired of how she treats us. I want everyone to know how she treats us. This is why Erin (Cousins) left."

Ms. Gotfryd asserted that Ms. Church "doesn't like me, in fact she hates me." Ms. Gotfryd points to the December 22nd incident as further proof that Ms. Church "doesn't communicate

5

consistently, and she gives me approval then takes it away. Depending on what mood she is in, her inconsistency makes it hard for me to do my job, then she blames me for the errors and belittles me repeatedly. It's a false narrative but it impacts my work and performance." Ms. Gotfryd added that her probation period ends this February, and she firmly believes that Ms. Church's conduct towards her is driven by the fact that she seeks the termination of her employment and has a bias against her that is manifests in the intentional undervaluing and misrepresentation of her work.

According to Ms. Gotfryd, she and Ms. Church "were in a pretty good place until I raised the issue of race," further asserting that Ms. Church is hostile towards her "because of my views on anti-racism," which she believes violates the City's Equal Employment and Anti-Harassment policy.

Ms. Gotfryd asserts that Ms. Church's violations of the City's Workplace Violence Prevention stem from the fact that Ms. Church told her she doesn't know what she is doing, that she is failing, hasn't done this type of work before, and she is unwilling to listen or to learn.

On January 7th, 2021, I received an email from Ms. Gotfryd, in which she informed me that on January 6th, she encountered Ernest Klepeis, Congressman Maloney's District Director, and she "casually asked him if he had received a request for a letter of support for the grant in question." Per Ms. Gotfryd, the Congressman's District Director stated that he had not received the request, and he asked that the information be sent to him so the letter of support could be prepared. Ms. Gotfryd further provided that she sent the information to the Director a short time later, and she copied Ms. Church in the email. Ms. Gotfryd also provided that on January 7th, she received the letter of support from Congressman Maloney's office.

During our meeting, Ms. Gotfryd acknowledged her conduct during the incident with Ms. Church on December 22nd, and her self-assessment aligned quite well with the information provided by Ms. Church and her witness Ms. Miller. Ms. Gotfryd also offered that she is "struggling mental health wise," and is "depressed," as a result of the "ongoing problems" with Ms. Church, but she confirmed that she is not under the care of a medical provider.

6

Alexandra Church:

Alexandra Church stated that at approximately 8:30 am on December 22nd, Ms. Gotfryd asked her for help reaching Congressman Mahoney's office to secure his support for a grant on which she was working. She confirmed that she asked Ms. Gotfryd to work on the grant but was surprised to hear that Ms. Gotfryd had contacted Congressman Mahoney's office, adding that "we've had multiple conversations in which I asked her to copy me. This is when I found out that she was discussing the grant without copying me." Ms. Church provided that she then asked Ms. Gotfryd to forward all related correspondence to her, which she did. Upon review, Ms. Church then went to Ms. Gotfryd's office to discuss the matter further, at which time "Elka became completely agitated, basically having a temper tantrum." Per Ms. Church, Ms. Gotfryd called her a "tyrant," said "the world needs to know," "you hate me," and said she would be "recording all interactions with her, yelling do you consent?"

Ms. Church informed me that she never asked Ms. Gotfryd to remove any of the racism content from her document, nor did she request that the issue of the board members' ethnicity be removed. However, she did confirm Ms. Gotfryd's allegation that she expressed concerns about the risk of exposing the City to a discrimination lawsuit. Ms. Church informed me that she does not feel that Ms. Gotfryd's assessment belongs in the grant application itself, adding "it's about the grant application being done properly." Ms. Church asserted that at no time did she yell at Ms. Gotfryd, but she acknowledged saying several times, "we've talked about this." Ms. Church described what she called "the narrative scope" of the grant Ms. Gotfryd asked her to review as "well crafted," but opined that "what she sent to me that she presented to Maloney wasn't well presented, maybe that's why he didn't respond." Ms. Church stated that Ms. Gotfryd "doesn't react well to my criticism." I asked Ms. Church whether, considering her acknowledgment that Ms. Gotfryd doesn't react well to her criticism, she had given any thought to utilizing another method to communicate with Ms. Gotfryd, and she asked me to clarify my question. I then asked Ms. Church, citing the concerns she expressed to me over the legal exposure she felt specific comments Ms. Gotfryd included in the draft application would have exposed the City to, if she had given any thought to running the question by someone in the Office of Corporation Counsel, to seek their expert advice and or guidance, and she said she had not. Ms.

7

Church did provide that some of her concerns over Ms. Gotfryd contacting someone in Congressman Maloney's office stem from the fact that Mr. Donat, the City Manager, had previously been Congressman Maloney's Chief of Staff and he still enjoys communicating with the Congressman's office in pursuit of mutual interests, and he wants us to adhere to a strict protocol in all interactions between the City and the Congressman's office.

Ms. Church also stated that during the incident on December 22nd, Ms. Gotfryd was screaming at her so aggressively that "the next step could be physical, that's where this is." Ms. Church further provided that after the incident, Ms. Gotfryd left the office and returned at approximately 2:20 pm and that during this time, she had no idea of Ms. Gotfryd's whereabouts.

We reviewed the language contained in section 65-12 of the City's Workplace Violence Prevention Policy, and Ms. Church provided she has "no concerns" that she may have violated the policy, as alleged by Ms. Gotfryd.

### Tara Miller:

Ms. Miller confirmed that Ms. Church is her direct supervisor, and understood that her name was provided to me by Ms. Church. Ms. Miller also confirmed her presence during the December 22nd incident between Ms. Gotfryd and Ms. Church. She stated that while in her office, she heard the exchange between Ms. Church and Ms. Gotfryd, which left her "bothered and very disturbed." She stated that "Ally went into Elka's office and Ally said to Elka that she couldn't send something, I'm not sure what that was." She then heard Elka say, "it's an all-White board." Ms. Miller further stated that she heard Elka say that Ally was yelling at her, and Ally then said, no, I'm not. Ms. Miller described the incident, which she said lasted "about two and a half minutes," as "nerve wracking," further adding that when the incident ended, she called Jeremy Kaufman in the office of Corporation Counsel to inform him of the incident and seek his advice on how to handle the matter. Ms. Miller told me that she filed a complaint against Ms. Gotfryd in response to the incident.

According to Ms. Miller, Ms. Gotfryd was yelling, and on a scale of one to ten, she reported that the volume of her voice reached an eight, particularly when Ms. Gotfryd said, "that's why Erin left!" She provided that Ms. Church did not raise her voice during the incident.

According to Ms. Miller, "Elka was disrespectful to the entire department...something has to be done."

Ms. Miller opined that "Elka doesn't want to hear or listen to department protocols." Adding that "it's hard to communicate with her, she twists things around," and that she no longer interacts with Ms. Gotfryd because "things just seem to not get better."

### ANALYSIS:

In a letter dated December 22nd, 2020, Elka Gotfryd alleged that Alexandra Church, her immediate supervisor, engaged in a hostile manner towards her on the morning of December 22nd. Specifically, Ms. Gotfryd asserts that Ms. Church made "berating comments regarding my character and the quality of my work," which "constitute hostility and belittlement." Ms. Gotfryd further alleges that Ms. Church is "obstructing my ability to perform my work duties as a civil servant with integrity as she has instructed me to omit a key fact in framing this work." Ms. Gotfryd further asserts that the incident on December 22nd "illustrates a pattern of Ms. Church's contradictory directives and gas lighting," and that the incident is "evidence of Ms. Church's implicit bias as well as her retaliation against me."

Ms. Church did not deny that in November, she had given Ms. Gotfryd approval to pursue the grant. It is clear that Ms. Gotfryd then began applying for the grant, and on the morning of December 9th Ms. Gotfryd emailed Steven Majano, to request a letter of support from Congressman Maloney, as required within the grant application. Mr. Majano replied to Ms. Gotfryd on the morning of December 11th and indicated that he would forward the request to the District Director. Although no evidence was provided as to what, if any interim steps occurred to secure the letter of support, we do know that on the morning of December 22nd, Ms. Gotfryd approached Ms. Church to ask her to assist with getting the letter of support from Congressman Maloney's office because she was having trouble doing so. This request and the

9

subsequent conversations between Ms. Gotfryd and Ms. Church led to Ms. Gotfryd's complaint and this investigation. Ms. Gotfryd provided that at no time during their December 22nd discussion, or any time subsequent, did Ms. Church give her any indication that she would reach out to Congressman Maloney's office to secure the letter of support. Ms. Gotfryd also informed me that she believes Ms. Church put forth no effort to secure the required letter of support to further her ongoing attempt to minimize her work quality, knowing that in the absence of the letter, the grant application itself could not go forward.

Based on the emails provided, it is clear that on the morning of January 6th, 2021, Ms. Gotfryd ran into Ernest Klepeis, District Director for Congressman Maloney's office, and inquired as to whether he had received or was aware of the request for a letter of support she had sent on December 9th. Mr. Klepeis indicated that he was not aware of the request and asked Ms. Gotfryd to send him the information. Mr. Klepeis then initiated an email to Ms. Gotfryd, which is time-stamped at 8:45 am on January 6th, asking that Ms. Gotfryd "send along the grant information and we'll get a letter of support together for you." He also provided his cellphone number, adding "if you ever need it." At 9:07 am on January 6th, Ms. Gotfryd replied to Mr. Klepeis, copying Ms. Church, and stating, among other things, that she was "sending you what I sent to Stephen a while back-not sure if he has already forwarded to your colleague. It all happened right before the holiday's, which I know is a busy time. Regardless, thank you for your readiness to support this initiative. We are quickly approaching the deadline, which is next Tuesday, January 12th, so even greater thanks in advance are due to the last-minute request on our part." Mr. Klepeis, in an email, time-stamped at 9:10 am on January 6th, informed Ms. Gotfryd that he was adding Brynna Trumpetto to the thread and that she would advance the request. At 9:19 am on January 6th, Ms. Trumpetto sent an email in which she requested a project summary for the grant to begin to put together the letter of support needed. She also inquired about the application deadline. At 9:23 am, Ms. Gotfryd responded to Ms. Trumpetto, provided the previously sent project summary, and informed Ms. Trumpetto of the January 12th deadline. At 10:56 am on January 7th, Ms. Trumpetto emailed Ms. Gotfryd a copy of the drafted letter of support from Congressman Maloney's office, positioning the grant application to

proceed in a timely fashion. According to Ms. Gotfryd, Ms. Church then reviewed the application in its entirety, and all documents were submitted. Ms. Gotfryd added that Ms. Church "also gave some constructive feedback." Ms. Gotfryd provided that upon completion of this process, Ms. Church "was quite supportive and did not express any significant pushback."

Ms. Church acknowledged to me that Ms. Gotfryd "presented a well-crafted narrative on the scope of the grant," and that "what she sent to me that she presented to Maloney wasn't well presented, maybe that's why Maloney didn't respond." She added, "it's not about the grant, I just think it needs to be done properly," and that she and Ms. Gotfryd have had "multiple conversations in which I asked her to copy me, and this (the incident on December 22nd) is how I found out she was discussing the grant without copying me." Ms. Gotfryd acknowledged to me that she did not copy Ms. Church every time she communicated with someone about the grant, in part because she wanted to prove to Ms. Church that she is competent, and was planning to submit a draft of the application for her review once she secured the letter of support. Ms. Gotfryd further stated that she felt she had received Ms. Church's approval to pursue the grant in November, and the two had since spoken twice about the status of the grant application. Moreover, Ms. Gotfryd asserts that since Ms. Church had done grant writing before, she should have understood the process and the inherent requirements. Summarized, Ms. Gotfryd believed that she had Ms. Church's approval, both tacit and explicit, and Ms. Gotfryd again asserted that Ms. Church never told her that any emails she wrote needed to be reviewed by her before being sent. While meeting with me, Ms. Church did not provide any concerns over the quality of Ms. Gotfryd's work on the grant. Instead, she seems to have had a problem with Ms. Gotfryd contacting a member of Congressman Maloney's staff to secure the letter of support, without her knowledge. During our meeting, Ms. Church opined that the communication Ms. Gotfryd sent to Congressman Maloney's office was subpar, and perhaps that is why no response was received. It must be noted that nothing in the record presented by Ms. Gotfryd or Ms. Church, either while meeting with me on January 5th, 2021, or provided electronically, indicates that Ms. Church, in support of Ms. Gotfryd's original request for assistance on December 22nd, ever moved to secure the letter of support from Congressman

11

Newburgh 000398

Maloney's office at any time between December 22nd and the morning of January 6th, when Ms. Gotfryd unexpectedly ran into Mr. Klepeis and inquired about the status of the request. In my review of the document Ms. Gotfryd provided, which she sent to Steven Majano on the morning of December 9th, to request of Congressman Maloney a letter of support for the grant, I did not find the communication to be problematic in any way, as asserted by Ms. Church. Additionally, even when meeting with me on January 5th, Ms. Church did not indicate that she had taken any steps to secure the required letter of support, despite effectively directing Ms. Gotfryd to cease her involvement with the grant on December 22nd and asserting, within her email on December 22nd at 9:16:23 am to Joseph Donat and Michelle Kelson, that she directed Ms. Gotfryd not to pursue the letter of support, that she "would find a contact for her, to please draft a letter of support and I would get it circulated." However, Ms. Gotfryd had already sent the request, and upon learning of this, and subsequently reviewing a copy of the communication Ms. Gotfryd had already sent, Ms. Church, while meeting with me, assailed the quality of the request, and asserted that this was the likely reason for the lack of reply from the Congressman's office. If Ms. Church, upon first reviewing the letter on December 22nd, felt that it was deficient or unacceptable, she should have contacted the Congressman's office immediately to inform them that a revised letter would soon be forthcoming, and not to place any weight on the initial letter as they consider the request for a letter of support, or directed Ms. Gotfryd, or another member of her staff, to revise the letter, submit it to her for approval, and then send the revision to the appropriate person in the Congressman's office. The concerns Ms. Church presented while meeting with me regarding Ms. Gotfryd's violation of real or imagined protocol may or may not be justified. However, the problems she raised to me regarding the quality of Ms. Gotfryd's written communication to the Congressman's office seemed to be without merit. Perhaps more illustratively, on January 6th, Mr. Klepeis received a copy of the Ms. Gotfryd's original request, reviewed it, and immediately proceeded to secure the support needed. If Mr. Klepeis, a key member of the Congressman's staff, had any questions or concerns about the request, the grant itself, or the work Ms. Gotfryd had done on it to date, at no time did they arise within the body of the emails that were exchanged during the morning of January 6th, and in this notable absence it seems reasonable to assume that the

12

information Ms. Gotfryd had sent was deemed sufficient, particularly since a draft of the letter Ms. Gotfryd had requested was received the very next day.

During this investigation, a critical question arose, which is; but for what Ms. Gotfryd called a "serendipitous" run-in with Ernest Klepeis on the morning of January 6th, during which she inquired about the status of her December 9th request and his immediate action to facilitate it, when would the letter have been secured, if at all, and might the City have missed the application deadline altogether, ultimately not receiving the grant, and would the blame for this have been attributed to Ms. Gotfryd when it appears, as a result of this investigation, that she had done everything required to facilitate completion of the application?

Ms. Gotfryd provided in her written complaint that she believes Ms. Church's conduct violates the following City of Newburgh polices:

- Section 65-12 of Newburgh's Workplace Violence Prevention Policy, and subsections A, C, D.

While meeting with me on January 5th, 2021, Ms. Gotfryd amended her complaint to include the City of Newburgh's Equal Opportunity Employment and Anti-Harassment Policy. Still, she did not cite a specific section or subsection of the policy.

**Section 34-18 of the City's Equal Employment Opportunity and Anti-Harassment Policy** addresses individuals and conduct and confirms that the policy applies to Ms. Gotfryd and Ms. Church, as employees of the City of Newburgh.

**Section 34-20. A.1 of the City's Equal Employment Opportunity and Anti-Harassment policy states the following:**

Harassment based on any protected characteristics.
- A. Harassment based on any protected characteristics is strictly prohibited by the City.
    1) "pursuant to this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, creed, gender, national origin, age, disability, marital status, citizenship status, military or veteran status, sexual orientation, genetic information, or any other characteristic protected by applicable law and that:

13

(a) Has the purpose or effect of creating an intimidating, or hostile work environment;
(b) Has the purpose and effect of unreasonably interfering with an individual's work performance; or
(c) Otherwise adversely affects an individual's employment opportunities."

**The City's Equal Employment Opportunity and Anti-Harassment Policy** further states: "Harassing conduct includes, but is not limited to: epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group (including through email)."

**Section 65-10 of the City of Newburgh's Workplace Violence Prevention Policy** is a general policy statement leading to the more relevant content, which defines violence and or workplace violence as: "any physical assault, acts of aggressive behavior including but not limited to verbal threats, displays of force, stalking or other threatening behavior that reasonably rises to the level of perception of potential violence occurring in the workplace, including with or without the use of any means, weapon or instrumentality." The policy further defines threatening or non-emergency as "a person, through intimidating words or gestures, has induced fear and apprehension of physical or harm in another person, but there is no immediate danger of such harm being inflicted."

**Section 65-12 of the City of Newburgh's Workplace Violence Prevention policy** explicitly prohibits the following activities:

A) Verbal or physical conduct that demonstrates explicit or implicit ridicule, mockery, derision, or belittlement of any person.
B) Any offensive or derogatory remarks based on race, color, sex, age, religion, sexual orientation or preference or national origin, either directly or indirectly, to another person. Such harassment is a prohibited form of discrimination under state and federal employment law.
C) Any verbal or physical conduct that has the purpose or effect of substantially interfering with the employee's ability to do his or her job.
D) Any verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

14

E) Intentional physical contact for the purpose of causing harm, such as but not limited to slamming, stabbing, punching, striking, shoving, or other physical attack.

F) Menacing or threatening behavior, such as but not limited to throwing objects, pounding on a desk or door, damaging property, stalking or otherwise acting aggressively, or making oral or written statements specifically intended to frighten, coerce or threaten, where a reasonable person would interpret such behavior as constituting evidence of intent to cause harm to individuals or property.

G) Possession of firearms, imitation firearms, knives, or other dangerous weapons, including but not limited to chemical/biological weapons, instruments, or materials, except as permitted by law, rule, or regulation.

**INVESTIGATION FINDINGS:**

Pertaining to Ms. Gotfryd's allegation that Ms. Church violated her rights as contained in **Sections 34-18 and 34-20. A.1 of the City of Newburgh's Equal Employment Opportunity and Anti-Harassment Policy,** this investigation did not find that Ms. Gotfryd was being harassed based on gender or any other protected characteristics. Ms. Church has not engaged in conduct that rises to the level of harassment or that "denigrates or shows hostility or aversion toward" Ms. Gotfryd. While Ms. Gotfryd does assert that philosophical differences over approaches to racism are at the center of their ongoing conflict, the City's Equal Employment Opportunity and Anti-Harassment Policy does not extend to differing philosophies of employees in addressing what they perceive to be the City's systemic matters, nor does the policy extend to real or imagined concerns employees might have regarding the City's chosen approaches to urban development and renewal, or the impact of City policy on residents of the City. Regardless, even where Ms. Church and Ms. Gotfryd may disagree over the best approach to these problems, Ms. Gotfryd must still adhere to any reasonable directives issued by Ms. Church, her supervisor, even when she is not in agreement with them, or risk being deemed insubordinate.

15

Pertaining to Ms. Gotfryd's allegation that Ms. Church violated her rights as contained in **Section 65-12 of the City of Newburgh's Workplace Violence Prevention policy**, this investigation did not find that Ms. Church violated the policy, per se, or subjected Ms. Gotfryd to "any physical assault, acts of aggressive behavior including but not limited to verbal threats, displays of force, stalking or other threatening behavior that reasonably rises to the level of perception of potential violence occurring in the workplace, including with or without the use of any means, weapon or instrumentality."

This investigation also determined that Ms. Church did not violate **Subsection A of 65-12**, which explicitly prohibits "Verbal or physical conduct that demonstrates explicit or implicit ridicule, mockery, derision, or belittlement of any person," nor was it determined during the course of this investigation that Ms. Church violated **Subsection C of 65-12**, which explicitly prohibits "Any verbal or physical conduct that has the purpose or effect of substantially interfering with the employee's ability to do his or her job." Here, while Ms. Gotfryd does allege that Ms. Church had interfered with her work, I did not find Ms. Church's conduct to "substantially" interfere, in part because Ms. Gotfryd managed to maintain the progress of the grant application when she encountered Mr. Klepeis on the morning of January 6th and worked with him and his office to secure the letter of support needed. Continuing, this investigation did not find, regarding Ms. Gotfryd's allegation that Ms. Church violated her rights as contained in **Subsection D of 65-12,** which explicitly prohibits "Any verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile, or offensive working environment," that during her interactions with Ms. Gotfryd, Ms. Church's conduct had "the purpose or effect of creating an intimidating, hostile, or offensive working environment." Here, while Ms. Gotfryd does allege that Ms. Church's conduct on the morning of December 22nd was 'belittling" and "hostile," nothing Ms. Church said or did during the incident, which by all accounts lasted approximately 2 and one half minutes, had "the purpose or effect of *creating* an intimidating, hostile, or offensive working environment," because preexisting tensions were present between Ms. Church and Ms. Gotfryd before the incident on December 22nd, which they both were well aware of, but at no point rose to the level of violating policy. While this investigation

16

confirmed that Ms. Church's conduct during the December 22nd incident did not violate policy, the investigation did find cause to question some of Ms. Church's conduct, as outlined below:

1) When Ms. Gotfryd approached Ms. Church for assistance on December 22nd it doesn't appear that Ms. Church provided any, nor did she attempt to embrace the work Ms. Gotfryd had successfully completed. Instead, she appears to have focused on what she felt was a protocol infraction by Ms. Gotfryd, who came to her in need of help to complete an assignment to secure a grant to aid the City.

2) Ms. Church provided, that although she possessed discomfort over the legal exposure she felt comments Ms. Gotfryd included in the draft application would have exposed the City to, she never sought the expertise of someone in the Office of Corporation Counsel, to determine whether the language used by Ms. Gotfryd did, in fact, pose a legal risk to the City, and if so, proceed to ask that person to provide feedback to Ms. Gotfryd, or communicate the legal advisory to remove the concerning language.

3) This investigation confirmed that Ms. Church never pursued the letter of support Ms. Gotfryd sought her help with, and even after Ms. Gotfryd spoke with someone on January 6th who was in the position to secure the Congressman's support, she copied Ms. Gotfryd in an email she sent to the Congressman's staffer, to make Ms. Church aware of this critical new development. At no time while meeting with me on January 5th, or within the emails on which she was copied January 6th or 7th was there any indication that Ms. Church had previously attempted to secure the letter required for the grant application. Instead, Ms. Church criticized Ms. Gotfryd for violating a protocol that may or may not have been clear. Furthermore, when Ms. Church met with me, she articulated a somewhat counterfactual assessment of Ms. Gotfryd's initial communication to a staffer in the Congressman's office, yet she never took any immediate action to address the concerns she allegedly had about the communication, nor did she appear to make any effort to secure the letter of support that was such a critical of the grant application.

4) Ms. Church's witness, Tara Miller, confirmed the December 22nd incident and provided her assessment of Ms. Gotfryd's time in the department. However, much of the information she provided appears to have been based on conversations she had with Ms. Church about Ms. Gotfryd and her assessment appeared to lack independence of thought. This was highlighted when Ms. Miller described Ms. Gotfryd's conduct during the incident, and it became apparent that Ms. Church and Ms. Miller both used similar, and in some cases, identical language in their assessments of Ms. Gotfryd, including the word "protocol," or the phrases "she twists things around," "it's hard to communicate with her," and even their use of term "temper tantrum." While I do not doubt that the incident between Ms. Church and Ms. Gotfryd on December 22nd caused Ms. Miller to experience the discomfort she described during our discussion, it should be noted that if it's true that in response to the incident, Ms. Miller filed a complaint against Ms. Gotfryd, she will be the third employee at the center of a complaint involving Ms. Gotfryd and Ms. Church, to admit to communicating in some way with Ms. Church about Ms. Gotfryd, or to have witnessed an incident between the two, and to have provided me with information that aligns very closely with Ms. Church's assessment of Ms. Gotfryd.

**SUMMARY:**

Ms. Gotfryd's allegation that on December 22nd, Ms. Church violated the City of Newburgh's Equal Employment Opportunity and Anti-Harassment Policy was not substantiated during this investigation.

Ms. Gotfryd's allegation that on December 22nd, Ms. Church violated the City of Newburgh's Workplace Violence Prevention policy, specifically subsections A, C, D, was not substantiated during this investigation.

Dr. John W. Coverdale, Investigator
The Center for Workplace *Solutions* Inc.
January 28th, 2021

18

Newburgh 000405

19

Newburgh 000406