UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/10/2024
```

ELKA GOTFRYD,

                  Plaintiff,

-against-

CITY OF NEWBURGH, ALEXANDRA CHURCH, and JOSEPH DONAT,

                  Defendants.

21 Civ. 4009 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    Plaintiff Elka Gotfryd commenced this action via complaint filed against Defendants City of Newburgh (the "City"), Alexandra Church, and Joseph Donat pursuant to 42 U.S.C. § 1983. ("Compl." ECF No. 6.) Plaintiff alleges Defendants violated her rights under the First and Fourteenth Amendments of the Constitution after they terminated her in retaliation of her advocacy for anti-racist policies.

    Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to dismiss Plaintiff's claims in their entirety. For the following reasons, the Court grants Defendants' motion.

## BACKGROUND

    The following facts are derived from the record, the parties' Rule 56.1 statements, and the parties' declarations and affidavits.[1] They are not in dispute unless otherwise noted.

---

[1] On March 6, 2023, the parties fully briefed the instant motion: Defendants' Motion for Summary Judgment (ECF No. 34); Defendants' Rule 56.1 Statement ("Def. 56.1," ECF No. 35); Defendants' Memorandum of Law in Support ("Def. Mem.," ECF No. 37); Defendants' Reply ("Def. Reply," ECF No. 38); Declaration of Lauren Schnitzer in Support of Defendants' Motion (ECF No. 36); Reply Affirmation of Lauren Schnitzer in Support of Defendants' Motion (ECF No. 39); Plaintiff's Memorandum of Law in Opposition ("Pl. Opp." ECF No. 41); and Plaintiff's Rule 56.1 Response and Counterstatement ("Pl. 56.1 Resp." or "Pl. 56.1 Counter," ECF No. 40). Attached to Plaintiff's Opposition is her affidavit, cited to as "Gotfryd Aff."

**A. Plaintiff's Role as City Planner for the City**

Plaintiff served in the Civil Service position of City Planner for the City of Newburgh (the "City") from February 2020 through March 9, 2021. (Def. 56.1 ¶¶ 1,8.) During her tenure, Defendant Joseph Donat served as City Manager and Defendant Alexandra Church served as the City's Director of Planning and Development. (*Id.* ¶¶ 2-3.) From March 5, 2020 until at least May 2020, Church took maternity leave of absence. (*Id.* ¶ 4.) Prior to and following her leave of absence, Church served as Plaintiff's direct supervisor and reported to Donat. (*Id.* ¶¶ 5, 7.)

In addition to her general job duties, Plaintiff's job functions for City Planner included providing information to the City's Planning Board (the "Board") on specific projects coming before the Board; preparing pre-application letters, called "informationals," in response to proposal applications submitted to the City; and handling long-term planning assignments, which included review of long-term planning projects. (*Id.* ¶¶ 14-16.) One of the main roles of City Planner included being able to hear multiple sides of an issue and to provide a voice to minority groups and unrepresented groups in a way that allows those individuals to be heard. (*Id.* ¶ 12.) However, Plaintiff contests that Church had either an interest in playing this role or in permitting Plaintiff to do so. (Pl. 56.1 Resp. ¶ 12.)

As City Planner, Plaintiff worked under the general supervision of the Director of the City's Department of Planning and Development (the "Department"). (Def. 56.1 ¶ 17.) The Department's functions include community development, "long-term planning," land use review, economic development, and management of a series of grants and policies. (*Id.* ¶ 18.) The Department

---

Citations to "Def. Ex." refer to the Exhibits attached to the Schnitzer's Declaration and Reply Affirmation. Where applicable, the Court refers to page numbers using the Bates numbers applied by the parties. Citations to the Transcript of Joseph Donat ("Donat Tr.") refer to Def. Ex. D.

evaluated changes to housing, changes to population, changes to parks, and changes to transportation. (*Id.* ¶ 19.)

### B. Plaintiff's Speech at Issue in the Action

#### a. Plaintiff's Draft Scope of Work for the Housing Needs Assessment

When Plaintiff first started as City Planner, the City was in the early stages of a housing needs assessment, which assesses the gaps in housing provisions in a particular geographic area. (Def. 56.1 ¶¶ 32-33.) For this project, the City hired the consultant Kevin Dwarka to study the existing conditions of various housing challenges within the City and to propose recommendations to address those challenges. (*Id.*) Plaintiff was tasked with reviewing and revising Dwarka's scope of work to ensure it met municipal needs. (*Id.* ¶ 34; Pl. 56.1 Resp. ¶ 34.) Church would then review the document and approve the final version before the project could commence. (Def. 56.1 ¶ 35.) Plaintiff reviewed Dwarka's draft scope of work and made several handwritten changes to and comments on that document. (*Id.* ¶ 36.)

Most relevant here, Plaintiff included new goals for the proposed project, two of which provided that the project would "[i]dentify antiracist, anti-displacement strategies for fair and accessible housing and economic development" and "[i]dentify mechanisms in place that perpetuate displacement and racism, barriers in making significant changes to these mechanisms, and leverage points to undo harm." (*Id.* ¶¶ 39-40.) Church reviewed, revised, and commented on Plaintiff's draft and, most relevant here, removed the words "antiracist" and "racism" from Plaintiff's proposed goals. (*Id.* ¶ 43; Pl. 56.1 Resp. ¶ 43.) Later, Plaintiff asked Church about the removal of the term "anti-racist," and Church explained she was concerned the term would alienate Hispanic homeowners. (Def. 56.1 ¶ 47; Pl. 56.1 Resp. ¶ 48; Gotfryd Aff. ¶ 6.)

b. *Plaintiff's June 8, 2020 Email to Newburgh Housing Coalition*

The Newburgh Housing Coalition (the "Coalition") is an informal committee consisting of individuals representing various organizations that focus on the City's housing issues. (Def. 56.1 ¶ 50.) In her capacity as City Planner, Plaintiff attended and helped coordinate the Coalition's meetings, including preparing meeting agendas. (*Id.* ¶¶ 51-52.) On June 8, 2020, prior to Church's review or approval, Plaintiff sent an email to the members of the Coalition and enclosed an agenda for a Zoom meeting scheduled later that day. (*Id.* ¶¶ 55, 56; Gotfryd Aff. ¶ 8.) Plaintiff included in the email a "draft list of working goals" that Plaintiff stated she intended to use as her "guide over the course of the next year of [her] tenure as City Planner." (*Id.* ¶ 57.) The third goal provided that Plaintiff would: "[i]dentify anti-racist and antidisplacement strategies for fair, accessible and safe housing and economic development." (*Id.* ¶ 58.) Church later directed Plaintiff to provide all memoranda she intended to circulate publicly to Church ahead of time. (*Id.* ¶ 60.)

On July 13, 2020, Plaintiff emailed Church regarding her use of the term "anti-racist" in external-facing work for the City. (*Id.* ¶ 62.) Plaintiff and Church again discussed Church's concerns that the term "anti-racist" could alienate some community members. (*Id.* ¶¶ 63-65; Gotfryd Aff. ¶ 9.) In the email, Church also stated the email was a "gross oversimplication of complicated topics." (Def. 56.1 ¶ 64 (citing Def. Ex. H at 492).)

c. *Plaintiff's Comments Regarding the City's Code Sweeps Program Meeting*

Plaintiff and Church attended at least one if not two meetings regarding the City's Code Sweeps program. (Def. 56.1 ¶ 68; Pl. 56.1 Resp. ¶ 68.) The Code Sweeps program was developed to improve housing conditions in City neighborhoods by locating and reducing City Code violations within certain geographic areas of the City. (Def. 56.1 ¶ 69.) In or around early August 2020, Plaintiff participated in a Code Sweeps meeting in her capacity as City Planner. (*Id.* ¶ 71.)

In early August 2020, Plaintiff emailed Church and another colleague summarizing her thoughts regarding the meeting, including her disagreement with the use of certain language to describe individuals living in poor housing conditions or with substance abuse disorders. (Def. 56.1 ¶ 72; *see* Def. Ex. M.) For example, Plaintiff raised concerns that (1) an individual had generalized people living in poor housing conditions as "all drug dealers or violent criminals"; (2) that city policies might facilitate the displacement of lower income minorities; and (3) during the meeting, the term "junkie" was used several times to refer to individuals struggling with substance abuse disorders. (Def. Ex. M at 249, 251.)

In response, Church advised that she and others would "work better" to use language that was not hurtful, pejorative, or accusatory, and explained that the City and its partners work to ensure services are provided to all residents, unsheltered or otherwise. (*Id.* at 249.) In response, Plaintiff offered to "help with outreach, with partnerships, [and] with making this program reflect the other good work we are doing." (*Id.*) Erin Cousins, the City's Neighborhood Stabilization Coordinator and chair of the Coalition committee while Church was on leave, also responded to the email. (Def. 56.1 ¶ 53.) She stated that Plaintiff had "misunderstood [her] so many times" that she no longer felt comfortable communicating with Plaintiff. (Def. Ex. M at 248.)

  d. *Plaintiff's Grant Application*

In or around November 2020, Plaintiff sought an African American Civil Rights History Grant for the City that was directed at exploring and exposing the history of African American civil rights advocacy in the city. (Def. 56.1 ¶ 92.) Despite her job description including administration and management of state and federal grants, Plaintiff did not fulfill that role. (Def. 56.1 ¶ 70; Gotfryd Aff. ¶ 10.) However, Plaintiff admits that her submission of the grant application was made within her capacity as City Planner. (*Id.* ¶ 94; Pl. 56.1 Resp. ¶ 94.) On or about December

5

22, 2020, Plaintiff submitted a letter to Donat and Michelle Kelson, the City's Corporation Counsel, regarding the grant application in which she complained that Church had told her to remove a phrase that described the Architectural Review Commission ("ARC") as "all-white." (Def. 56.1 ¶¶ 95-96, 85.) In her capacity as Plaintiff's supervisor, Church had instructed Plaintiff that she could not include in the City's grant application a description of the racial composition of the ARC. (*Id.* ¶ 97.)

### C. Plaintiff is Terminated

On March 9, 2021, Donat terminated Plaintiff. (Compl. ¶ 56.) The parties dispute the reasons for Plaintiff's termination.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (internal quotations and citations omitted).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## DISCUSSION

Plaintiff's Complaint allege two causes of action: (1) violation of Plaintiff's right to equal protection of the law under the Fourteenth Amendment by terminating Plaintiff "because she opposed discriminatory language and behavior, advocated for minority communities, and positively associated with minority leaders"; and (2) violation of Plaintiff's First Amendment rights by terminating Plaintiff "because she opposed discriminatory practices, something her supervisors deemed to be beyond her job functions and responsibilities." (Compl. ¶¶ 65-66.) Defendants argue they are entitled to summary judgment on both claims.

## I. First Amendment Retaliation Claim

Plaintiff alleges Defendants retaliated against her by terminating her because she advocated for the City to adopt anti-racist policies. "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir.2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir.2011)). Defendants argue Plaintiff's First Amendment retaliation claim should be dismissed because Plaintiff's speech was made pursuant to her official duties rather than in her capacity as a private citizen. (Def. Mem. at 4.) Plaintiff counters that Donat and her supervisors deemed Plaintiff's speech beyond the scope of her employment, and that she was acting as a citizen and not an employee in challenging the City's racist policies. (Pl. Opp. at 11-12.)

A public employee alleging First Amendment retaliation must allege that the speech concerned "matters of public concern rather than . . . personal interest . . . ." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir.2003) (internal quotation and citation omitted). "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); *Garcia v. State Univ. of N.Y. Health Sci. Ctr.*, 280 F.3d 98, 105 (2d Cir. 2001)). Importantly, "when public employees make statements pursuant to their *official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (emphasis added).

The Second Circuit has noted that whether an employee makes a statement pursuant to their official duties is an "objective" test. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 202 (2d Cir. 2010). "The inquiry into whether a public employee is speaking pursuant to her official job duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir.2012). Speech is made pursuant to a plaintiff's official duties "when the speech at issue owes its existence to those job duties, or when the speech is part-and-parcel of the employee's concerns about her ability to properly execute her duties." *Bloomberg v. New York City Dep't of Educ.*, 410 F. Supp. 3d 608, 620 (S.D.N.Y. 2019) (citing *Weintraub*, 593 F.3d at 202 and *Garcetti*, 547 U.S. at 421-22, 423)) (cleaned up). "[T]he key question in determining whether Plaintiff spoke as an employee or as a citizen is whether her speech was undertaken in the course of performing her primary employment responsibility and was aired in furtherance of execution of one of her core duties as principal." *Id.* 620 (citation omitted).

Though this inquiry "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Ganim*, 342 F.3d at 112 (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (citing *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684)).

The parties do not dispute the allegedly constitutionally protected speech at issue. Plaintiff alleges she engaged in protected speech when (1) in February 2020, she included the terms "racist" and "antiracist" within a draft scope of work for a proposed housing needs assessment; (2) in June 2020, she sent an email to members of the Coalition with her "draft working goals" that again included the term "anti-racist"; (3) in August 2020, she sent emails to Cousins and Church after attending a meeting regarding the implementation of the City's Code Sweeps program, which

9

raised concerns about the implementation of the program and stereotypical comments made about individuals in the neighborhood; and (4) in November 2020, she noted that the City's ARC was comprised of "all white" members in her grant application on behalf of the City. (Def. Mem. at 5-9; Pl. Opp. at 13-14.) Plaintiff has failed to raise a genuine issue of material fact. Plaintiff's own statements in her emails and her affidavit belie her assertion that she acted as a citizen and not an employee. The Court thus finds her speech occurred while she was acting within the scope of her official duties and warrant no First Amendment protection.

*First*, Plaintiff was tasked with reviewing the consultant's draft scope of work to ensure the proposed housing needs assessment met the needs of the municipality. (Def. 56.1 ¶ 43; Gotfryd Tr. 39:8-40:8.) Plaintiff does not dispute that she had been assigned this task as part of her job. (Def. 56.1 ¶ 36; Gotfryd Tr. 39:21-22 (stating she would be the "City liaison" for the consultant).) The consultant had been hired on behalf of the City, the scope of work was for a project to assess the housing needs of the City, and Plaintiff's supervisor was to review and approve the draft.

*Second*, Plaintiff prepared a meeting agenda for the Coalition's meeting that "included a draft list of working goals" that Plaintiff stated she intended to use as her "guide over the course of the next year of *[her] tenure as City Planner*." (Def. Ex. J at 643 (emphasis added).) By the plain text of the draft, Plaintiff again explicitly ties her speech to her role and job duties as City Planner. Later, Plaintiff even asks Church for clarification on her use of the term "anti-racist" with respect to "[the Department's] external-facing work" in an effort to avoid "*misrepresentation of the [D]epartment*." (Def. Ex. J at 492 (emphasis added).)

*Third*, Plaintiff admits she participated in the City Sweeps Program as the City Planner. (Def. 56.1 ¶ 71.) Moreover, the follow-up email occurs in the context of Plaintiff emailing her supervisor and colleague that she had been "pondering heavily about *our* approach to Code

Sweeps." (Def. Ex. M at 250 (emphasis added).) The word "our" here undoubtedly refers to the Department. For the remainder of the email, Plaintiff continues to place her thoughts in the context of her role in the Department. Plaintiff states "[she] appreciate[s] the work [the Department] is doing" but she has concerns that "some blind spots [] are leading [the Department] to engage in planning tactics that are essentially racist." (*Id.* at 251.) Plaintiff even ends the email by stating that she "will no longer have a doubt that our [D]epartment is interested in actively displacing marginalized communities, and complicit in gentrification of the City of Newburgh." (*Id.* at 250.) The emails that follow make clear that Plaintiff intended her statements to lead to "further dialogue" and additional "responsibility and initiative *as a member of the departmental team*." (*Id.* at 249 (emphasis added).) In her affidavit, Plaintiff even states she was "try[ing] to get [the Department] to realize [it] needed to adopt programmatic priorities which matched the city's need to overcome the impact of racist housing and re-development policies and properly serve a city so dominantly populated by people of color." (Gotfryd Aff. ¶11.)

*Finally*, Plaintiff admits that the submission of the grant application was made within her capacity as City Planner. (Def. 56.1 ¶ 94.) Moreover, Plaintiff herself even states that she was working on the grant application "[o]n behalf of the Department of Planning and Development." (Def. Ex. T at 253.) In her letter to Donat and Kelson, Plaintiff further ties her use of this language to her duties by stating in the letter that "Church is obstructing [her] ability to perform [her] *work duties as a civil servant* with integrity" by instructing Plaintiff to remove the "key fact" that the ARC was comprised of "all white" members. (*Id.* at 253 (emphasis added).)

Plaintiff's linking of her speech and actions to her efforts to bring anti-racist and anti-discrimination policies and practices to the Department as part of her role as City Planner is also explicitly stated throughout Plaintiff's Complaint. Plaintiff states that "within weeks" of starting

her employment, "she developed a goal that the City's planning efforts . . . should be 'anti-racist' in nature and should strive to be beneficial to residents of color in the City and to combat systemic racism." (Compl. ¶ 9.) Plaintiff further asserts she shared with the Coalition an agenda of target goals that included "the aim to 'identify anti-racist and anti-displacement strategies for fair, accessible, and safe housing and economic development." (*Id.* ¶¶ 14-16.) Plaintiff even alleges she "offered to work on more meaningful outreach, partnerships, and programs to combat issues of systemic racism in the City in a more meaningful way." (*Id.* ¶ 31.)

The undisputed evidence in the record overwhelmingly proves that Plaintiff's speech was made pursuant to her job as City Planner. Plaintiff reviewed and revised the draft scope of work and the meeting agenda as part of her job duties. She attended the City Sweeps meeting as a representative of the City and the Department, and the communications that followed were submitted to her supervisor with the goal of making concrete changes in the Department. Finally, Plaintiff submitted the grant application on behalf of the Department. It is clear here that Plaintiff's speech was "part-and-parcel" of her concerns with not only her ability to perform her job duties, but also with the Department's ability to perform its function in the City. *See Bloomberg*, 410 F. Supp. 3d at 620-21 (plaintiff-principal was speaking as an employee when she made a plea for resources and fairness as to the availability of extracurricular sports teams for her students).

The crux of Plaintiff's opposing argument is that Defendants deemed her advocacy and practices of anti-discrimination as "beyond the scope of her duties." (Gotfryd Aff. ¶ 3.) Specifically, Plaintiff claims that Defendants sought to curb her anti-racist advocacy, and "strongly suggested" she acted outside the scope of her duties whenever she raised concerns with the City's policies. (Pl. Opp. at 12.) However, the only evidence in the record showing that Defendants considered Plaintiff's use of the term "anti-racist" as beyond the scope of her duties is Donat's

testimony that "the city counsel was developing its own policy related to [anti-racism]" and therefore Plaintiff did not need to address it. (Donat Tr. 51:11-13; Def. 56.1 ¶ 49.) Plaintiff denies that this was even communicated to her and does not dispute that Church advised her against the use of the term "anti-racist" because of her concerns of alienating the Hispanic community. (Pl. Aff. ¶¶ 6-7, 9.) Regarding Plaintiff's emails relating to the Code Sweeps meeting, Cousins told Plaintiff she felt uncomfortable communicating with her because Plaintiff "misunderstood" her so many times. (Def. Ex. M at 248.) Beyond her conclusory assertions, Plaintiff fails to present any evidence in the record to support her contention that Church or any other member of the Department expressed or implied that her actions were beyond the scope of her job as City Planner.

In fact, the record clearly establishes that Plaintiff herself believed her actions to be within the scope of her duties. This is true even if, and Plaintiff has not established this to be the case, her supervisor pushed back on this belief. Plaintiff's undisputed belief and persistence in the need for herself as City Planner and the Department to promote and institute anti-racist and anti-discrimination policies and practices is sufficient to prove she engaged in such speech pursuant to her official duties. *Weintraub*, 593 F.3d at 202 (finding plaintiff's grievance was "pursuant to his official duties because it was part and parcel of his concerns about his ability to properly execute his duties") (citation omitted); *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011) ("When a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen.").

Accordingly, Plaintiff's speech does not fall within the protections of the First Amendment. Defendants are entitled to summary judgment on this claim.

### II. Fourteenth Amendment Retaliation Claim

Plaintiff argues Defendants seek to dismiss Plaintiff's Fourteenth Amendment Retaliation claim on the grounds that she fails to allege discrimination based on differential treatment[2] and that she never submitted a complaint that she faced discrimination. (Def. Reply at 8-9.) Plaintiff responds that she is alleging Defendants terminated her for "complaining about racial discrimination by her employer," specifically "through the City's failure to promote housing and anti-displacement policies[;] . . . administration of the Code Sweep program[;] . . . and by the stereotypic depiction of the residents of [certain sub-neighborhoods]." (Pl. Opp. at 22.)

Courts in the Second Circuit have routinely dismissed Fourteenth Amendment due process claims that are duplicative and/or derivative of claims for retaliation for First Amendment activity. *See Fierro v. City of New York*, No. 1:20-CV-09966-GHW, 2022 WL 428264, at *6 (S.D.N.Y. Feb. 10, 2022) ("[C]ourts in this Circuit routinely hold that equal protection claims premised on the same allegations as a First Amendment claim cannot proceed where the First Amendment claim has been dismissed."); *Loc. 3599, NYC Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-CV-1035 (JGLC), 2024 WL 966077, at *12 (S.D.N.Y. Mar. 6, 2024) (dismissing plaintiff's equal protection claim as duplicative of their First Amendment retaliation claim); *Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012) (same); *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) (same).

As made clear in her Opposition and her Complaint, Plaintiff's Fourteenth Amendment claim arises from the same factual allegations as her First Amendment claim. (*See* Compl. ¶¶ 65-

---

[2] An individual public employee may not bring a Fourteenth Amendment retaliation claim based on discrimination due to differential treatment not based on membership in a particular class—commonly referred to as a class-of-one claim. *Appel v. Spiridon,* 531 F.3d 138, 140–41 (2d Cir. 2008) (citing *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 594, 605–08, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008)).

66; Pl. Opp. at 22-24.) Accordingly, the Court dismisses Plaintiff's Fourteenth Amendment retaliation claim as derivative and duplicative of her First Amendment retaliation claim.

### III. *Monell* Claim

A municipality may be held liable under Section 1983 if "the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. *Jones v. Town of East Haven*, 691 F.3d 72 (2d Cir. 2012); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 698 (1978). "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694) (emphasis in original). To the extent a plaintiff fails to allege an underlying constitutional violation, his *Monell* claims must also fail. *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 568 (S.D.N.Y. 2021).

As the Court has dismissed Plaintiff's claims arising under the First and Fourteenth Amendment, "her *Monell* claims must likewise be dismissed." *Collymore v. City of New York*, 767 Fed. Appx. 42, 47 (2d Cir. 2019) (quoting *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013)).

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's causes of action are dismissed in their entirety. The Clerk of the Court is directed to terminate the motion at ECF No. 34, to enter judgment in favor of Defendants, and to terminate the action. SO ORDERED.

Dated: April 10, 2024
       White Plains, New York

                                                       Nelson S. Román, U.S.D.J.